IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**ROYAL PALM VILLAGE RESIDENTS, INC.,** on behalf of the homeowner-members in its representative capacity and on behalf of themselves and all others similarly situated,

      Plaintiffs,

Vs.

**MONICA SLIDER,
SHERI WOODWORTH,
BELINDA LAWSON,
SUN COMMUNITIES, INC.,
SUN COMMUNITIES OPERATING
LIMITED PARTNERSHIP,
SUN HOME SERVICES, INC.,
ROYAL PALM VILLAGE, LLC,
ROYAL PALM VILLAGE, L.L.C.,
AMERICAN LAND LEASE, INC.,
ASSET INVESTORS OPERATING
PARTNERSHIP, L.P.,
RICHARD LEE,
LUTZ, BOBO & TELFAIR, P.A.,** d/b/a Lutz, Bobo, Telfair, Eastman & Lee, f/k/a Lutz, Webb & Bobo, P.A.,

      Defendants.

_____/

CASE NO.

**CLASS ACTION REPRESENTATION
AND DEMAND FOR JURY TRIAL
INJUNCTIVE RELIEF SOUGHT**

**COMPLAINT**

Table of Contents

| Section | | | Pg. |
|---|---|---|---|
| 1.0 | Introduction: | | 8 |
| | **The Defendants act and conspire to circumvent statutory regulations to defraud and exploit elderly mobile home owners** | | 8 |
| 2.0 | Jurisdiction and Venue | | 9 |
| 3.0 | **Statutory background:** | | 10 |
| | 3.1 | The Florida Legislature recognizes mobile home owners' "unique hybrid tenancy" and need for regulation to protect their significant basic property and other rights, including their bargaining position | 10 |
| | 3.2 | The United States Supreme Court and California Federal District Court recognize the need to equalize the economic leverage mobile home park owners hold over mobile home owners | 11 |
| | 3.3 | Florida Courts also recognize the need to equalize the economic leverage mobile home park owners hold over mobile home owners | 13 |
| | 3.4 | The Florida Mobile Home Act provides broad protections for mobile home owners | 14 |
| | 3.5 | The Florida Mobile Home Act provides significant obligations, duties and restrictions upon park owners | 15 |
| | 3.6 | The park owner may not collect a charge which results in payment of money previously collected as part of lot rental | 17 |
| | 3.7 | The park owner may not terminate a mobile home owner's continuous tenancy or evict but for very limited grounds | 17 |
| | 3.8 | The park owner must deliver to the home owner an administratively approved prospectus prior to entering into an enforceable lot rental agreement | 18 |

3.9     The park owner must provide a 90 day advance written notice
        before increase in lot rental amount, reduction in services or
        utilities, or change in rules and regulations                          19

3.10    The park owner may not interfere with the assumption of the
        resale seller's existing prospectus by the resale home purchaser       21

3.11    The Court has broad discretion to fashion relief for mobile
        home owners                                                            22

4.0   Parties                                                                  23

      4.1     Plaintiff: Royal Palm Village Residents, Inc.                    23

      4.2     Defendants:                                                      24

              4.2.1   Monica Slider                                            24

              4.2.2   Sheri Woodworth                                          25

              4.2.3   Belinda Lawson                                           25

              4.2.4   Sun Communities, Inc.                                    26

              4.2.5   Sun Communities Limited Partnership                      29

              4.2.6   Sun Home Services, Inc.                                  30

              4.2.7   Royal Palm Village, LLC                                  31

              4.2.8   Royal Palm Village, L.L.C.                               31

              4.2.9   American Land Lease, Inc.                                32

              4.2.10  Asset Investors Operating Partnership, L.P.              33

              4.2.11  Richard Lee                                              33

              4.2.12  Lutz, Bobo & Telfair, P.A.                               33

5.0   Class Representation Allegations                                         34

6.0     **The Scheme:**                                                      39

Since 2015, the Defendants deceived over 400 elderly mobile home
owners and the Royal Palm HOA that their mobile home park was
lawfully purchased by the Defendants.                                        39

Subsequently, the Defendants acted and conspired to circumvent
statutory regulations under the Florida Mobile Home Act and
engaged in further deceit and extortion:                                     39

6.1     passing-on increased ad valorem taxes (resulting from
        the premium purchase price for the Park) to the elderly
        mobile home owners;                                                  41

6.2     illegally passed-on their annual fire and stormwater
        tax using only the 300 occupied lots instead of using
        all of the 396 permitted lots and the clubhouse,
        exercise room, maintenance building and office;                     41

6.3     lot rental categories (water, preserve, oversize) were
        actually discriminatory unreasonable lot rental increases;
        "water" was really retention pond. "Preserve" was really
        raw wetlands or scrub land—with associated premium
        lot rents;                                                          42

6.4     deceived and compelled the Royal Palm HOA to enter into an
        oppressive and illegal five year lot rental agreement;             44

6.5     Defendants promised to spend $1,000,000 on
        maintenance, repair, and replacement of roads, seawalls
        and common areas as an inducement to enter into the five
        year lot rental agreement;                                         46

6.6     Defendants Lee and Lutz Bobo Law Firm misrepresented
        the legal effect of the five year agreement to cause DBPR
        to withdraw the Royal Palm HOA's grant of mediation               46

6.7     misleading mobile home owners that the Park clubhouse
        and facilities is ADA compliant;                                   47

6.8     extorted and intimidated the Royal Palm HOA and
        the elderly mobile homeowners to withdraw their
        complaints;                                                        47

6.9     Plaintiffs-homeowner scenarios: representative examples of
        Defendants' false statements, and fraudulent omissions            50

| | | | |
|---|---|---|---|
| | 6.9.1 | Beverley and Dave Davies, Lot 113 | 50 |
| | 6.9.2 | Ken and Brenda Morgan, Lot 281 | 51 |
| | 6.9.3 | Harry and Joanne Rush, Lot 35 | 52 |
| | 6.9.4 | Stephen Hines, Lot 553 | 54 |
| | 6.9.5 | Laurie Skemp, Lot 264 | 54 |
| | **6.10** | **Mail and Wire Fraud** | 58 |
| | **6.11** | **Extortion** | 63 |
| **7.0** | **Claims** | | 67 |
| | **7.1** | **Count One – RICO** | 67 |
| | | 7.1.1 Slider-Woodworth-Lawson-Lee Enterprise | 67 |
| | | 7.1.2 Alternative 1: Sun Communities Enterprise | 68 |
| | | 7.1.3 Alternative 2: Royal Palm Village Mobile Home Park Enterprise | 69 |
| | | 7.1.4 Alternative 3: Lee Enterprise | 70 |
| | | 7.1.5 Alternative 4: Lutz Bobo Law Firm Enterprise | 71 |
| | | 7.1.6 Alternative 5: DBPR Enterprise | 71 |
| | **7.2** | **Count Two – RICO** | 73 |
| | | 7.2.1 Corporate Enterprise | 73 |
| | | 7.2.2 Alternative 1: Sun Communities Enterprise | 75 |
| | | 7.2.3 Alternative 2: Royal Palm Village Mobile Home Park Enterprise | 75 |
| | | 7.2.4 Alternative 3: Lee Enterprise | 77 |
| | | 7.2.5 Alternative 4: Lutz Bobo Law Firm Enterprise | 77 |
| | | 7.2.6 Alternative 5: DBPR Enterprise | 78 |
| | **7.3** | **Count Three – RICO** | 81 |
| | **7.4** | **Count Four – RICO Conspiracy** | 82 |
| | | 7.4.1 Sun Communities, Sun OLP, Sun Home Services, RP Village, RP Village2, ALL, AIOP,  and/or Lutz Bobo Law Firm conspired with Slider, Woodworth, Lawson, and/or Lee | 82 |

|  | 7.4.2 | AIOP, Sun OLP, and/or Sun Home Services conspired with Lee, and/or Slider | 83 |
|---|---|---|---|
|  | 7.4.3 | RP Village and RP Village2 conspired with Slider, Woodworth, Lawson, and/or Lee | 83 |
|  | 7.4.4 | RP Village, RP Village2, and ALL conspired with Lee | 84 |
| **7.5** | **Count Five – Unjust Enrichment** | | 85 |
| **7.6** | **Count Six – Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")** | | 86 |
| **7.7** | **Count Seven – Denial of Rights of Access under Americans with Disabilities Act ("ADA")** | | 90 |
|  | 7.7.1 | Site Entrance Signage | 93 |
|  | 7.7.2 | Accessible Parking | 93 |
|  | 7.7.3 | Exterior Accessible Routes | 93 |
|  | 7.7.4 | Accessible Doors | 93 |
|  | 7.7.5 | Restrooms | 93 |
|  | 7.7.6 | General | 94 |
|  | 7.7.7 | Failure to Remove Architectural Barriers in an Existing Facility | 95 |
|  | 7.7.8 | Failure to Make an Altered Facility Accessible | 96 |
|  | 7.7.9 | Failure to Modify Existing Policies and Procedures | 96 |
| **7.8** | **Count Eight - Florida Mobile Home Act - Breach of statutory duties and lot rental agreement** | | 97 |
|  | 7.8.1 | Defendants failed to comply with requirements of applicable building, housing, and health codes | 97 |
|  | 7.8.2 | Defendants failed to maintain utility connections and systems for which the Park Owner is responsible in proper operating condition | 99 |
|  | 7.8.3 | Defendants failed to maintain the common areas in a good state of appearance, safety, and cleanliness | 100 |
|  | 7.8.4 | Defendants failed to maintain buildings and improvements in common areas in a good state of repair and maintenance | 100 |

|  |  |  |
|---|---|---|
| 7.8.5 | Defendants failed to provide access to the common areas at all reasonable times for the benefit of the Park residents and their guests | 101 |
| 7.8.6 | Defendants failed to comply with properly promulgated Park rules and regulations | 102 |
| 7.8.7 | Defendants unreasonably disturb or breach the peace of Park residents | 102 |
| 7.8.8 | Defendants failed to comply with their statutory obligations of good faith and fair dealings | 103 |
| 8.0 | Demand for Jury Trial | 105 |
| 9.0 | Relief Requested | 105 |

Plaintiff Royal Palm Village Residents, Inc., on behalf of themselves and all others similarly situated, by and through the undersigned counsel, brings this lawsuit against Defendants Monica Slider, an individual, Sheri Woodworth, an individual, Belinda Lawson, an individual, Sun Communities, Inc., a foreign (Maryland) corporation, Sun Communities Operating Limited Partnership, a foreign (Michigan) limited partnership, Sun Home Services, Inc., a foreign (Michigan) corporation, Royal Palm Village, LLC, a foreign (Michigan) limited liability company, Royal Palm Village, L.L.C., a foreign (Georgia) limited liability company, American Land Lease, Inc., a foreign (Delaware) corporation, Asset Investors Operating Partnership, L.P., a foreign (Michigan) limited partnership, Richard Lee, an individual, and Lutz, Bobo & Telfair, P.A., d/b/a Lutz, Bobo, Telfair, Eastman & Lee, f/k/a Lutz, Webb & Bobo, P.A., a Florida Corporation, collectively referred to herein as "Defendants," and alleges:

**1.0    Introduction:**

**The Defendants act and conspire to circumvent statutory regulations to defraud and exploit elderly mobile home owners**

1.      This is a class action of current and past mobile homeowners who own or owned a mobile home and lease or leased the lot underneath their home at the Royal Palm Village Mobile Home Park and is brought under the federal Racketeer Influenced and Corrupt Organization ("RICO") statute, 18 U.S.C. § 1961, *et seq.*, and various other federal and state common law doctrines or statutes. This action arises out of Defendants' fraudulent and conspiratorial acts since 2015 to illegally and unreasonably deceive over 400 elderly mobile home owners and their representative incorporated homeowner association, Royal Palm Village Residents, Inc., that their mobile home park was lawfully purchased by the Defendants. Subsequently, the Defendants acted and conspired to circumvent statutory regulations under the Florida Mobile Home Act and engaged in further deceit and extortion, including, but not limited to:

- passing-on increased ad valorem taxes (resulting from the premium purchase price for the Park) to the elderly mobile home owners;

- illegally passed-on their annual fire and stormwater tax using only the 300 occupied lots instead of using all of the 396 permitted lots and the clubhouse, exercise room, maintenance building and office;

- lot rental categories (water, preserve, oversize) were actually discriminatory unreasonable lot rental increases; "water" was really retention pond. "Preserve" was really raw wetlands or scrub land—with associated premium lot rents;

- deceived and compelled the Royal Palm Village Residents, Inc., to enter into an oppressive and illegal five year lot rental agreement;

- Defendants promised to spend $1,000,000 on maintenance, repair, and replacement of roads, seawalls and common areas as an inducement to enter into the five year lot rental agreement;

- Defendants Lee and Lutz Bobo Law Firm misrepresented the legal effect of the five year agreement to cause DBPR to withdraw the Royal Palm Village Residents, Inc.'s grant of mediation

- misleading mobile home owners that the Park clubhouse and facilities are ADA compliant;

- extorted and intimidated the Royal Palm HOA and the elderly mobile homeowners to withdraw their complaints.

Plaintiffs request a declaratory judgment that Defendants' conduct violates various Federal and Florida laws, and seeks an award of treble damages, actual, statutory, and to the extent permitted, punitive damages, attorneys fees and costs for themselves and each member of the Class.

## 2.0    Jurisdiction and Venue

2.      This action is brought under the federal Racketeer Influenced and Corrupt Organization ("RICO") statute, 18 U.S.C. § 1961, *et seq.*, and various other state common law doctrines or statutes. Jurisdiction is vested in this Court by virtue of 28 U.S.C. § 1331. Plaintiffs' claims brought under state law are so related to Plaintiffs' federal claims, over which the Court has original jurisdiction, that they form part of the same case or controversy. Under Article III of the United States Constitution, the Court has

supplemental jurisdiction over Plaintiffs' related state common law and statutory claims pursuant to 28 U.S.C. § 1367. The Plaintiffs seek damages and declaratory relief pursuant to 28 U.S.C. § 2201.

3.      In the alternative, the ends of justice require that the Court exercise personal jurisdiction over all Defendants pursuant to 18 U.S.C. § 1965(b) in that the Court has personal jurisdiction over at least one defendant, (2) the defendants engaged in a multi-district conspiracy, and (3) there is no other district in which a Court would have personal jurisdiction over all of the Defendants.

4.      A substantial part of the events and omissions giving rise to the claims stated herein occurred in this District and a substantial part of the property that is the subject of this action is situated in this District. Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(2) and pursuant to 18 U.S.C. § 1965(b).

**3.0    Statutory background:**

**3.1    The Florida Legislature recognizes mobile homeowners' "unique hybrid tenancy" and need for regulation to protect their significant basic property and other rights, including their bargaining position**

5.      Florida mobile homeowners typically rent the lot underneath their home from the mobile home park owner pursuant to a long term lease. In 1992 the Florida Legislature recognized this unique hybrid tenancy and the mobile homeowners' need for regulation to protect their significant basic property and other rights, including their bargaining position once occupancy has commenced:

\*\*\*

The Legislature finds that there are factors unique to the relationship between a mobile home owner and a mobile home park owner. **Once occupancy has commenced, unique factors can affect the bargaining position of the parties and can affect the operation of market forces.** Because of those unique factors, there exist inherently real and substantial differences in the relationship which distinguish it from other landlord-tenant relationships. The Legislature recognizes that mobile home owners have basic property and other rights which must be protected. The Legislature further recognizes that the mobile home park owner has a legitimate business interest in the operation of the mobile home park as part of the housing market and has basic property and other rights which must be protected. This chapter is created for the purpose of regulating the factors unique to the relationship between mobile home owners and mobile home park owners in the circumstances described herein. It recognizes that **when such inequalities exist between mobile home owners and mobile home park owners as a result of such unique factors, regulation to protect those parties to the extent that they are affected by the inequalities, while preserving and protecting the rights of both parties, is required.**

\*\*\*

§ 723.004(1)(Emphasis added), 1992 Fla. Sess. Law Serv. Ch. 92-148 (C.S.H.B. 217

**3.2    The United States Supreme Court and California Federal District Court recognize the need to equalize the economic leverage mobile home park owners hold over mobile home owners**

6.      In the 1992 United States Supreme Court decision in *Yee v. City of Escondido, Cal.,* Justice O'Connor similarly observed the unique or hybrid nature of a mobile home tenancy and that once occupancy has commenced that "...  it is necessary that the owners of mobilehomes occupied within mobilehome parks be provided with the unique protection from actual or constructive eviction afforded by the provisions of this chapter [California's similar Mobilehome Residency Law, Cal.Civ.Code Ann. § 798 et seq.]...":

> The term ′mobile home′ is somewhat misleading. Mobile homes are largely immobile as a practical matter, because the cost of moving one is often a significant fraction of the value of the mobile home itself. They are generally placed permanently in parks; once in place, only about 1 in every 100 mobile homes is ever moved. Hirsch & Hirsch, *Legal– Economic Analysis of Rent Controls in a Mobile Home Context: Placement Values and Vacancy Decontrol*, 35 UCLA L. Rev. 399, 405 (1988). A mobile home owner typically rents a plot of land, called a "pad," from the owner of a mobile home park. The park owner provides private roads within the park, common facilities such as washing machines or a swimming pool, and often utilities. The mobile home owner often invests in site-specific improvements such as a driveway, steps, walkways, porches, or landscaping. When the mobile home owner wishes to move, the mobile home is usually sold in place, and the purchaser continues to rent the pad on which the mobile home is located.
>
> In 1978, California enacted its Mobilehome Residency Law, Cal.Civ. Code Ann. § 798 et seq. (West 1982 and Supp.1991). The legislature found "that, because of the high cost of moving mobilehomes, the potential for damage resulting therefrom, the requirements relating to the installation of mobilehomes, and the cost of landscaping or lot preparation, **it is necessary that the owners of mobilehomes occupied within mobilehome parks be provided with the unique protection from actual or constructive eviction afforded by the provisions of this chapter."** § 798.55(a).

*Yee v. City of Escondido, Cal.*, 503 U.S. 519, 522 (1992)(Emphasis added)

7.      And in the 2010 decision of *Guggenheim v. City of Goleta,* the United States District Court for the Central District of California construed the same California remedial mobile home statute and observed that: "… Mobile homes have the peculiar characteristic of separating ownership of homes that are, as a practical matter, affixed to the land, from the land itself. **Because the owner of the mobile home cannot readily move it to get a lower rent, the owner of the land has the owner of the mobile home over a barrel**….." 638 F.3d 1111 (9th Cir. 2010)[footnotes omitted][Emphasis Added]

Page 12

**3.3    Florida Courts also recognize the need to equalize the economic leverage mobile home park owners hold over mobile home owners**

8.    In the 1992 decision in *Herrick v. Florida Dept. of Business Regulation, Div. of Florida Land Sales, Condominiums and Mobile Homes,* the First District Court of Appeal reaffirmed that the Florida Mobile Home Act is a remedial statute enacted to protect mobile homeowners. 595 So.2d 148 (Fla. 1st DCA 1992):

\*\*\*

> **… [T]he purpose for enacting The Florida Mobile Home Act was to protect mobile homeowners, by equalizing the economic leverage mobile home park owners hold over the tenants.** 1 J. Hauser, *Florida Residential Landlord–Tenant Manual,* Chapter 8 (Supp.1991). In *Stewart v. Green*, 300 So.2d 889 (Fla.1974) and *Palm Beach Mobile Homes, Inc. v. Strong*, 300 So.2d 881 (Fla.1974), the supreme court observed that the legislature had finally recognized "that a hybrid type of property relationship exists between the mobile home owner and the park owner and that the relationship is not simply one of landowner and tenant." *Stewart*, 300 So.2d at 892. Mobile home tenancy usually involves persons who own their residences which are of considerable size, and once set up in a park, the residences are not mobile in the real sense of the word. "**Because of the difficulties inherent in moving the home from one settled location to another, … it is hard to imagine a situation where the park owner and the tenants are in an equal bargaining position on rent increases.**" *Belcher v. Kier*, 558 So.2d 1039, 1042 (Fla. 2d DCA), *review denied,* 570 So.2d 1305 (Fla.1990). *See also Harris v. Martin Regency, Ltd.,* 576 So.2d 1294, 1297 (Fla.1991); *Lanca Homeowners, Inc. v. Lantana Cascade of Palm Beach, Ltd.,* 541 So.2d 1121, 1124 (Fla.), *cert. denied*, 493 U.S. 964, 110 S.Ct. 405, 107 L.Ed.2d 371 (1989); *B.J. Pearce v. Doral Mobile Home Villas, Inc.*, 521 So.2d 282 (Fla. 2d DCA 1988). The current costs of moving a mobile home range from $4,000 to $10,000. *See* 1 J. Hauser, *Landlord–Tenant Manual,* at 69.
>
> **The delivery of a prospectus** to all residents of a mobile home park containing twenty-six or more lots, is **one factor in the legislative effort to afford protection to occupants and prospective occupants** of a park. The prospectus is a disclosure document. Village *Park Mobile Home Assoc. v. State, Dept. of Business Regulation, Div. of Florida Land Sales, Condominiums and Mobile Homes,* 506 So.2d 426, 428 (Fla. 1st DCA), *review denied*, 513 So.2d 1063 (Fla.1987). It is drafted by the park owner,

and must contain information as specified by [section 723.012, *Florida Statutes,* including a description of the manner in which utilities and other services are to be provided, an explanation of the manner in which lot rentals will be increased, a provision for ninety days advance notice of any increase or reduction in service, and disclosure of any rate increase or pass through charges to which the homeowner could be subjected. *Village Park v. Dept. of Business Regulation,* 506 So.2d at 428. That is, the prospectus delineates the basis for, and the procedure governing, future rent increases. [*Id.,* at 429.] Unless the park owner fully discloses all proposed fees, charges, and assessments, he waives the right to obtain such in the future. *Lemon v. Aspen Emerald Lakes Assoc., Ltd.,* 446 So.2d 177 (Fla. 5th DCA 1984)]

***

*Herrick v. Florida Dept. of Business Regulation, Div. of Florida Land Sales, Condominiums and Mobile Homes,* 595 So.2d 148 (Fla. 1st DCA 1992)(Emphasis added)

### 3.4   The Florida Mobile Home Act provides broad protections for mobile home owners

9.   The homeowner protections of the Florida Mobile Home Act include:

- An express statutory obligation of good faith and fair dealing in the performance or enforcement of every rental agreement or duty;[1]

- "Lot rental agreement" is broadly defined to include "any mutual understanding or lease, whether oral or written;"[2]

- Required statutory provisions are deemed to be a part of the lot rental agreement;[3]

- Lot rental agreement may not contain any rule or regulation prohibited by or inconsistent with the Florida Mobile Home Act;[4]

- Any provision in the lot rental agreement is void and unenforceable to the extent that it attempts to waive or preclude the rights, remedies, or requirements set forth in the Florida Mobile Home Act or arising

---

[1]   § 723.021
[2]   § 723.003(10)
[3]   § 723.031(2)
[4]   § 723.031(1)

under law;[5]

- Park rules and regulations and the prospectus are deemed to be incorporated into the lot rental agreement;[6]

- Rental terms shall be for a minimum of one year;[7]

- No rental agreement shall provide for, nor be construed for, the termination of tenancy or the eviction of a mobile home owner on a ground other than one contained in § 723.061.[8]

**3.5    The Florida Mobile Home Act provides significant obligations, duties and restrictions upon park owners**

10.    "Park owner" is broadly defined to also include the property operator who has been delegated the authority to act as the park owner in matters relating to the administration and management of the mobile home park.[9] The obligations, duties, and restrictions imposed upon both park owner and operator include:

- The park owner must comply with applicable building, housing, and health codes;

- The park owner must maintain buildings and improvements in common areas in a good state of repair and maintenance;[10]

- The park owner must maintain the common areas in a good state of appearance, safety, and cleanliness;[11]

- The park owner must provide access to common areas, including buildings and improvements at all reasonable times for the homeowners and their guests.[12]

---

5       § 723.032(2)
6       § 723.031(10)
7       § 723.031(4)
8       §§723.031(9), 723.032(1)
9       §§ 723.003(13), 723.003(16)
10      § 723.022(2)
11      § 723.022(2)
12      § 723.022(3)

- The park owner must maintain utility connections and systems in proper operating condition;[13]

- The park owner must comply with park rules and regulations and require that other persons also comply and conduct themselves in a manner that does not unreasonably disturb the homeowners or constitute a breach of the peace;[14]

- The park owner is expressly prohibited from committing unreasonable acts. "Unreasonable" is defined to mean arbitrary, capricious, or inconsistent with the Florida Mobile Home Act;[15]

- The park owner is expressly prohibited from committing discriminatory acts. "Discriminatory" means that a homeowner is being treated differently as to the rent charged, the services rendered, or an action for possession or other civil action being taken by the park owner, without a reasonable basis for the different treatment;[16]

- The park owner may not discriminatorily increase a home owner's lot rent or discriminatorily decrease services to a home owner, or bring or threaten to bring an action for eviction or other civil action primarily because the park owner is retaliating against the home owner. The park owner may not retaliate against the homeowner for: 1) his or her good faith complaints to a governmental agency charged with enforcing regulations in a mobile home park; 2) the homeowner's organization, encouragement, or participation in a homeowner's association; or 3) the homeowner has complained to the park owner for failure to comply with §723.022. [17]

---

13    §723.022(4)
14    §723.022(5)
15    §§ 723.003(20), 723.033(3), 723.037(5), 723.037(5), 723.037(5), 723.054(2), 723.059(1), 723.025
16    §§ 723.003(1), 723.031(5), 723.058(5), 723.0615
17    § 723.0615

**3.6    The park owner may not collect a charge which results in payment of money previously collected as part of lot rental**

11.    The park owner may not collect a charge which results in payment of money for sums previously collected as part of the lot rental amount:

- Ad valorem property taxes, non-ad valorem assessments, and utility charges may be passed on only if those charges are not otherwise being collected in the remainder of the lot rental amount and they were disclosed prior to tenancy, were being passed on as a matter of custom between the park owner and the mobile home owner, or the passing on was authorized by law;[18]

- Ad valorem property taxes, non-ad valorem assessments, and utility charges may be passed on only within one year of the date the park owner remits payment of the charge.[19]

**3.7    The park owner may not terminate a mobile homeowner's continuous tenancy or evict but for very limited grounds**

12.    A properly promulgated rule or regulation may not be arbitrarily applied and used as a ground for eviction.[20] Those very limited grounds for termination of tenancy and eviction of a mobile home owner, occupant, or home are:

- nonpayment of lot rental;[21]

- conviction of a crime committed in the Park detrimental to the health, safety, or welfare of other residents of the mobile home park;[22]

- violation of rule or regulation, rental agreement provision, or the Florida Mobile Home Act which is found by any court to have been an act that endangered the life, health, safety, or property of the park

---

18    § 723.031(5)(c)
19    § 723.031(5)(c)
20    § 723.061(1)(c)
21    § 723.061(1)(a)
22    § 723.061(1)(b)

residents or employees or the peaceful enjoyment of the mobile home park by its residents;[23]

- a second violation of the same rule or regulation, rental agreement provision, or the Florida Mobile Home Act within 12 months if the park owner has noticed the mobile home owner, tenant, or occupant within 30 days after the first violation, which specified the actions of the mobile home owner, tenant, or occupant that caused the violation and gave the mobile home owner, tenant, or occupant 7 days to correct the noncompliance;[24]

- a change in use of the land comprising the mobile home park, or the portion thereof from which mobile homes are to be evicted, from mobile home lot rentals to some other use.[25]

### 3.8    The park owner must deliver to the homeowner an administratively approved prospectus prior to entering into an enforceable lot rental agreement

13.    The prospectus or offering circular together with its exhibits is a disclosure document intended to afford protection to mobile homeowners. The purpose of the document is to disclose the representations of the mobile home park owner concerning the operations of the mobile home park.[26] It must detail the Park services, facilities, and all financial obligations of the tenancy:

- Prior to entering into an enforceable rental agreement for a mobile home lot, the park owner shall deliver to the homeowner a prospectus approved by the division together with all of the exhibits. Delivery shall be made prior to execution of the lot rental agreement or at the time of occupancy, whichever occurs first;[27]

---

23      § 723.061(1)(c)1
24      § 723.061(1)(c)2
25      § 723.061(1)(d)
26      § 723.011(3)
27      §§ 723.011(1)(a) and (2); *see also Rule* 61B-31.001(12), *Fla. Admin. Code*

- The park owner may request that the homeowner sign a receipt indicating that the homeowner has received a copy of the prospectus, the rules and regulations, and other pertinent documents so long as any such documents are clearly identified in the receipt itself. Such a receipt shall indicate nothing more than that the documents identified herein have been received by the mobile home owner;[28]

- If the park owner fails to deliver the prospectus and exhibits to the prospective lessee prior to the execution of the lot rental agreement or prior to initial occupancy, the rental agreement is voidable by the lessee until 15 days after the receipt by the lessee of the prospectus and exhibits. Upon written notice of cancellation by the lessee, the lessee will be entitled to a refund from the park owner of any deposit together with relocation costs for the mobile home, or the market value of the home and any paid appurtenances.[29]

### 3.9 The park owner must provide a 90 day advance written notice before increase in lot rental amount, reduction in services or utilities, or change in rules and regulations

14.    The park owner must give written notice to each affected mobile home owner and the board of directors of the homeowners' association at least 90 days before any increase in lot rental amount or reduction in services or utilities provided by the park owner or change in rules and regulations:

- The home owner's right to the 90-day notice may not be waived or precluded by a home owner, or the homeowners' committee, in an agreement with the park owner;[30]

- The park owner may be compelled by the incorporated homeowners'

---

28      § 723.011(5)
29      § 723.014
30      § 723.037(1)

association to meet with the association's statutory negotiating committee to explain the material factors which accompany the decision to increase the lot rental or reduce services, or change utilities;[31]

- At the meeting, the park owner shall in good faith disclose and explain all material factors resulting in the decision to increase the lot rental amount, reduce services or utilities, or change rules and regulations, including how those factors justify the specific change proposed. The park owner may not limit the discussion of the reasons for the change to generalities only, such as, but not limited to, increases in operational costs, changes in economic conditions, or rents charged by comparable mobile home parks. For example, if the reason for an increase in lot rental amount is an increase in operational costs, the park owner must disclose the item or items which have increased, the amount of the increase, any similar item or items which have decreased, and the amount of the decrease. If an increase is based upon the lot rental amount charged by comparable mobile home parks, the park owner shall disclose, and provide in writing to the committee at or before the meeting, the name, address, lot rental amount, and any other relevant factors relied upon by the park owner, such as facilities, services, and amenities, concerning the comparable mobile home parks. The information concerning comparable mobile home parks to be exchanged by the parties is to encourage a dialogue concerning the reasons used by the park owner for the increase in lot rental amount and to encourage the home owners to evaluate and discuss the reasons

---

31       § 723.037(4)(b)1

for those changes with the park owner. The park owner shall prepare a
written summary of the material factors and retain a copy for 3 years.
The park owner shall provide the committee a copy of the summary at
or before the meeting;[32]

- "Market rent" is defined to mean that rent which would result from
market forces absent an unequal bargaining position between mobile
home park owners and mobile home owners;[33]

- In determining market rent, the court may consider rents charged
by comparable mobile home parks in its competitive area. To be
comparable, a mobile home park must offer similar facilities, services,
amenities, and management.[34]

**3.10  The park owner may not interfere with the assumption of the resale seller's existing prospectus by the resale home purchaser**

15.     The resale mobile home owner has a statutory right to sell his or her home
and accompanying pre-existing prospectus. The resale purchaser also has an express
statutory right to assume the resale seller's existing prospectus:

- A purchaser of a mobile home has the right to assume the remainder
of the term of any rental agreement then in effect between the park
owner and the seller and shall be entitled to rely on the terms and
conditions of the prospectus or offering circular as delivered to the
initial recipient;[35]

- A park owner may increase the rental amount to be paid by the
purchaser upon the expiration of the assumed rental agreement in

---

32      § 723.037(4)(b)
33      § 723.033(4)
34      § 723.033(5)
35      § 723.059(3); *Rule* 61B-31.001(4), *Fla. Admin. Code:* (4) "The prospectus distributed to a home owner or prospective home owner shall be binding for the length of the tenancy, including any assumptions of that tenancy, and may not be changed except in the following circumstances: ..."

an amount deemed appropriate by the mobile home park owner, so long as such increase is disclosed to the purchaser prior to his or her occupancy and is imposed in a manner consistent with the initial offering circular or prospectus and the Florida Mobile Home Act;[36]

- Lifetime leases and the renewal provisions in automatically renewable leases, both those existing and those entered into after July 1, 1986, are not assumable unless otherwise provided in the mobile home lot rental agreement or unless the transferee is the home owner's spouse. The right to an assumption of the lease by a spouse may be exercised only one time during the term of that lease.[37]

**3.11    The Court has broad discretion to fashion relief for mobile homeowners**

16.    The Court may:

- find a mobile home lot rental amount, rent increase, or change, or any provision of the rental agreement, to be unreasonable. The court may enforce the remainder of the lot rental agreement without the unreasonable provision or limit the application of the unreasonable provision so as to avoid any unreasonable result;[38]

- find that a party to a lot rental agreement or duty under the Florida Mobile Home Act has not complied with its obligations of good faith and fair dealing and award reasonable attorneys fees and costs to the prevailing party for proving noncompliance;[39]

- rescind a contract or award damages to a mobile homeowner who reasonably relies upon any material statement or information that is false or misleading and published by or under authority from the park

---

36    § 723.059(4)
37    § 723.059(5)
38    § 723.033(1)
39    § 723.021

owner in advertising and promotional materials, including, but not limited to, a prospectus, the items required as exhibits to a prospectus, brochures, and newspaper advertising.[40]

**4.0    Parties**

**4.1    Plaintiffs: Royal Palm Village Residents, Inc. ("Royal Palm HOA")**

17.    Plaintiff Royal Palm Village Residents, Inc., ("Royal Palm HOA") is an incorporated mobile home owner association and the legal representative under § 723.075 (1), *Fla. Stat.*, of a class of over 400 elderly current and former bona fide mobile home owners in the Royal Palm Village Mobile Home Park, 3000 US Highway 17-92 West, Polk County, Haines City, Florida. Royal Palm Village Mobile Home Park is an age 55 and older mobile home park with 380 approved mobile home lots (with a maximum of 547 lots expected).

18.    Royal Palm HOA represents all of the mobile homeowners in the Park "... in all matters relating to the Florida Mobile Home Act." *See* §§ 723.075(1) and 723.076(1); *see also Rule* 1.222, *Fla. R. Civil P.*[41]

---

40    § 723.017
41    § 723.075(1); *see also Rule 1.222: Fla. R. Civ. P.,* Mobile Homeowners' Associations, which reads:

A mobile homeowners' association may institute, maintain, settle, or appeal actions or hearings in its name on behalf of all homeowners concerning matters of common interest, including, but not limited to: the common property; structural components of a building or other improvements; mechanical, electrical, and plumbing elements serving the park property; and protests of ad valorem taxes on commonly used facilities. If the association has the authority to maintain a class action under this rule, the association may be joined in an action as representative of that class with reference to litigation and disputes involving the matters for which the association could bring a class action under this. Nothing herein limits any statutory or common law right of any individual homeowner or class of homeowners to bring any action which may otherwise be available. An action under this rule shall not be subject to the requirements of rule 1.220.

*Lanca Homeowners, Inc. v. Lantana Cascade of Palm Beach, Ltd.*, 541 So.2d 1121 (Fla. 1988)("... we similarly note that the **unique features of mobile home residency call for an effective procedural format for resolving disputes between park owners and residents concerning matters of shared interest. Again, we recognize the usefulness of the policy sought to be asserted by the legislature.** Pursuant to Florida Rule of Judicial Administration 2.130(a), we adopt the following to be titled "*Mobile Homeowners' Association,*" to be numbered *Florida Rule of Civil Procedure 1.222*, and to be effective immediately....") (Emphasis Added)

19.     The officers and directors of the Royal Palm HOA have a fiduciary relationship to the homeowners and must discharge their duties in good faith.[42]

20.     Royal Palm HOA has the authority to initiate mediation and litigation on behalf of all of the homeowners regarding an increase in lot rental amount, reduction in services or utilities, or change of rules and regulations.[43]

21.     If the park owner offers the Park for sale to the general public or receives an "unsolicited" offer to purchase the Park, the Royal Palm HOA has a right to be notified of the offer, the price and the terms and conditions of sale, and permitted 45 days to execute a contract meeting the price, terms and conditions.[44] Royal Palm HOA has the express statutory right to negotiate for, acquire, and operate the mobile home park on behalf of the mobile home owners.[45]

## 4.2     Defendants

### 4.2.1   Monica Slider ("Slider")

22.     Defendant Monica Slider ("Slider") is an individual who currently resides in Polk County, Florida. Slider is an employee of Defendant Sun Communities, Inc., and is the Regional Vice President of Defendant Sun Communities, Inc. Slider is also engaged in business at Royal Palm Village Mobile Home Park, 3000 US Highway 17-92 West, Polk County, Haines City, Florida.

23.     Slider is the "mobile home park owner" of Royal Palm Village Mobile Home Park as defined by § 723.003(13), *Fla. Stat.,* which includes an "owner" or "operator." Slider is also an "operator" of Royal Palm Village Mobile Home Park as defined by § 723.003(16), *Fla. Stat.,* as "a person who has been delegated the authority to act as the park owner in matters relating to the administration and management of the mobile home park, including, but not limited to, authority to make decisions relating to

---

42      § 723.078(2)(c)8
43      § 723.037(1)
44      § 723.071(1)(a)
45      §§ 723.077(1), 723.079(1) and (3)

the mobile home park."

### 4.2.2   Sheri Woodworth ("Woodworth")

24.    Defendant Sheri Woodworth ("Woodworth") is an individual who currently resides in Oviedo, Florida. Woodworth is an employee of Defendant Sun Communities, Inc., and is the Division Vice President of Sales & Operations for Sun Communities, Inc., at Royal Palm Village Mobile Home Park.

25.    Woodworth is the "mobile home park owner" of Royal Palm Village Mobile Home Park as defined by § 723.003(13), *Fla. Stat.,* which includes an "owner" or "operator." Woodworth is also an "operator" of Royal Palm Village Mobile Home Park as defined by § 723.003(16), *Fla. Stat.,* as "a person who has been delegated the authority to act as the park owner in matters relating to the administration and management of the mobile home park, including, but not limited to, authority to make decisions relating to the mobile home park."

### 4.2.3   Belinda Lawson ("Lawson")

26.    Defendant Belinda Lawson ("Lawson") is an individual who currently resides in Polk County, Florida. Lawson is an employee of Defendant Sun Communities, Inc. Lawson is the park manager at Royal Palm Village Mobile Home Park.

27.    Lawson is the "mobile home park owner" of Royal Palm Village Mobile Home Park as defined by § 723.003(13), *Fla. Stat.,* which includes an "owner" or "operator." Lawson is also an "operator" of Royal Palm Village Mobile Home Park as defined by § 723.003(16), *Fla. Stat.,* as "a person who has been delegated the authority to act as the park owner in matters relating to the administration and management of the mobile home park, including, but not limited to, authority to make decisions relating to the mobile home park."

### 4.2.4   Sun Communities, Inc. ("Sun Communities")

28.     Defendant Sun Communities, Inc. ("Sun Communities"), is a NYSE publicly traded foreign (Maryland) corporation. Sun Communities' executive and principal property management office is located at 27777 Franklin Road, Suite 200, Southfield, Michigan. Sun Communities has regional property management offices located in Ft. Myers and Orlando, Florida. Sun Communities is also engaged in business at Royal Palm Village Mobile Home Park, 3000 US Highway 17-92 West, Polk County, Haines City, Florida.

29.     According to its 2018 10-K, Sun Communities is a "fully integrated real estate company" and a "self-administered and self-managed real estate investment trust." Together with its affiliates and predecessors, Sun Communities has been in the business of acquiring, operating, developing, and expanding mobile home and recreational vehicle communities since 1975. Sun Communities leases individual parcels of land with utility access for placement of manufactured homes and recreational vehicles ("RVs") to their customers.

30.     Sun Communities owns over 250 wholly-owned or majority-owned and controlled subsidiaries, including its main operating subsidiary, Sun Communities Operating Limited Partnership, a Michigan limited partnership. Sun Communities is also engaged through a subsidiary, Sun Home Services, Inc., a Michigan corporation, in the marketing, selling, and leasing of new and pre-owned homes to current and future residents in their communities.

31.     The Sun Communities Operating Limited Partnership ("Operating Partnership") is structured as an umbrella partnership REIT, or UPREIT. In 1993, Sun Communities contributed its net assets to the Operating Partnership in exchange for the sole general partner interest in the Operating Partnership and the majority of all the Operating Partnership's initial capital. Sun Communities conducts substantially all of its

operations through the Operating Partnership. The Operating Partnership owns, either directly or indirectly through other subsidiaries, all of their assets. As the sole general partner of the Operating Partnership, Sun Communities generally has the power to manage and have complete control over the conduct of the Operating Partnership's affairs and all decisions or actions made or taken by Sun Communities as the general partner pursuant to the partnership agreement are generally binding upon all of the partners and the Operating Partnership.

32.     As of December 31, 2018, Sun Communities owned, operated or had an interest in a portfolio of 371 properties in 31 states and Ontario, Canada, including 230 mobile home communities, 110 RV communities, and 31 Properties containing both mobile home and RV sites. 124 properties, representing approximately 34.1 percent of developed sites, are located in Florida.

33.     Sun Communities is the "mobile home park owner" of Royal Palm Village Mobile Home Park as defined by § 723.003(13), *Fla. Stat.,* which includes an "owner" or "operator." Sun Communities is also an "operator" of Royal Palm Village Mobile Home Park as defined by § 723.003(16), *Fla. Stat.,* as "a person who has been delegated the authority to act as the park owner in matters relating to the administration and management of the mobile home park, including, but not limited to, authority to make decisions relating to the mobile home park." Sun Communities is a "person" as defined by §1.01(3), *Fla. Stat.*, to include: "… individuals, children, firms, associations, joint adventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations, and all other groups or combinations." "The singular includes the plural and vice versa." §1.01(1), *Fla. Stat.*

34.   Sun Communities has a Code of Business Conduct & Ethics. The

pertinent sections are reproduced below (emphasis added):

### CODE OF BUSINESS CONDUCT & ETHICS

I.   Introduction

Sun Communities, Inc. (together with its subsidiaries, the "Company") seeks at all times to **conduct its business in accordance with the highest standards of honest and ethical conduct and in compliance with applicable laws, rules and regulations**. This Code of Business Conduct and Ethics (the "Code") governs the business decisions made and actions taken by the Company's employees, officers and directors and is an expression of the Company's fundamental and core values which include: (i) integrity and honesty in the Company's and its team members' dealings with customers, suppliers, co-venturers, competitors, shareholders and the community; (ii) respect for individuality and personal experience and background; and (iii) support of the communities where the Company and its team members work. All references in the Code to "team members" should be understood to include all employees, officers and directors of the Company (including its subsidiaries), unless the context requires otherwise.

These core values and the other standards of conduct in this Code provide general guidance for resolving a variety of legal and ethical questions for team members. However, while the specific provisions of this Code attempt to describe certain foreseeable circumstances and to state the team member's, officer's and director's obligations in such event, it is impossible to anticipate all possibilities. Therefore, in addition to compliance with the Code and applicable laws, rules and regulations, **all Company team members are expected to observe the highest standards of business and personal ethics in the discharge of their assigned duties and responsibilities.**

The integrity, reputation and profitability of the Company ultimately depend upon the individual actions of the Company's team members. As a result, **each such individual is personally responsible and accountable for compliance with this Code.**

This Code is in addition to any other Company policies and/or agreements and is not intended to reduce or limit other obligations that team members may have to the Company.

\*\*\*

Page 28

G.   Compliance with Laws, Rules and Regulations

The Company is committed to conducting its business with honesty and integrity and in compliance with all applicable laws, rules and regulations. **No team member shall engage in any unlawful or unethical activity, or instruct others to do so, for any reason.** Team members are required to comply with the insider trading laws which make it unlawful for any person who has material non-public information about the Company to trade the stock or other securities of the Company or to disclose such information to others who may trade, as well as the Company′s insider trading policy.

As a team member conducts the Company′s business, he or she may encounter a variety of legal issues. If team members have questions on specific laws, rules or regulations they should contact the Compliance Officer who will determine whether to notify the Company′s outside legal counsel.

\*\*\*

J.   Fair Dealing

Team members should endeavor to **act fairly, honestly, ethically and in accordance with applicable laws in all business dealings** on behalf of the Company, including in all dealings with the Company′s customers, suppliers, competitors and team members. **No team member should take unfair advantage of another person through manipulation, concealment, abuse of privileged or confidential information, misrepresentation of material facts, or any other unfair dealing practice.** Whenever the ethical or legal requirements of a situation are unclear, team members should contact their supervisor or the Compliance Officer.

\*\*\*

**4.2.5   Sun Communities Operating Limited Partnership (″Sun OLP″)**

34.   Defendant Sun Communities Operating Limited Partnership (″Sun OLP″) is a foreign (Michigan) limited partnership. Sun OLP is the main operating subsidiary of Defendant Sun Communities. Sun OLP′s executive and principal property management office is located at 27777 Franklin Road, Suite 200, Southfield, Michigan. Sun OLP is also engaged in business at Royal Palm Village Mobile Home Park, 3000 US Highway 17-92 West, Polk County, Haines City, Florida.

Page 29

35.     Sun OLP is the "mobile home park owner" of Royal Palm Village Mobile Home Park as defined by § 723.003(13), *Fla. Stat.,* which includes an "owner" or "operator." Sun OLP is also an "operator" of Royal Palm Village Mobile Home Park as defined by § 723.003(16), *Fla. Stat.,* as "a person who has been delegated the authority to act as the park owner in matters relating to the administration and management of the mobile home park, including, but not limited to, authority to make decisions relating to the mobile home park."Sun OLP is a "person" as defined by §1.01(3), *Fla. Stat.*, to include: "… individuals, children, firms, associations, joint adventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations, and all other groups or combinations." "The singular includes the plural and vice versa." §1.01(1), *Fla. Stat.*

### 4.2.6   Sun Home Services, Inc. ("Sun Home Services")

36.     Defendant Sun Home Services, Inc. ("Sun Home Services") is a foreign (Michigan) corporation. Sun Home Services is a wholly owned and controlled subsidiary of Defendant Sun Communities and is engaged in the marketing, selling, and leasing of new and pre-owned homes to current and future residents in their communities. Sun Home Services' executive and principal property management office is located at 27777 Franklin Road, Suite 200, Southfield, Michigan. Sun Home Services is also engaged in business at Royal Palm Village Mobile Home Park, 3000 US Highway 17-92 West, Polk County, Haines City, Florida.

37.     Sun Home Services is the "mobile home park owner" of Royal Palm Village Mobile Home Park as defined by § 723.003(13), *Fla. Stat.,* which includes an "owner" or "operator." Sun Home Services is also an "operator" of Royal Palm Village Mobile Home Park as defined by § 723.003(16), *Fla. Stat.,* as "a person who has been delegated the authority to act as the park owner in matters relating to the administration and management of the mobile home park, including, but not limited to, authority to make decisions relating to the mobile home park." Sun Home Services is a "person" as

defined by §1.01(3), *Fla. Stat.*, to include: "… individuals, children, firms, associations, joint adventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations, and all other groups or combinations." "The singular includes the plural and vice versa." §1.01(1), *Fla. Stat. Stat.*

### 4.2.7   Royal Palm Village, LLC ("RP Village")

38.   Defendant Royal Palm Village, LLC ("RP Village"), is a foreign (Michigan) limited liability company and is also engaged in business at Royal Palm Village Mobile Home Park, 3000 US Highway 17-92 West, Polk County, Haines City, Florida.

39.   RP Village is the "mobile home park owner" of Royal Palm Village Mobile Home Park as defined by § 723.003(13), *Fla. Stat.,* which includes an "owner" or "operator." RP Village is also an "operator" of Royal Palm Village Mobile Home Park as defined by § 723.003(16), *Fla. Stat.,* as "a person who has been delegated the authority to act as the park owner in matters relating to the administration and management of the mobile home park, including, but not limited to, authority to make decisions relating to the mobile home park." RP Village is a "person" as defined by §1.01(3), *Fla. Stat.*, to include: "… individuals, children, firms, associations, joint adventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations, and all other groups or combinations." "The singular includes the plural and vice versa." §1.01(1), *Fla. Stat.*

### 4.2.8   Royal Palm Village, L.L.C. ("RP Village2")

40.   Defendant Royal Palm Village, L.L.C. ("RP Village2"), was a foreign (Georgia) limited liability company and was also engaged in business at Royal Palm Village Mobile Home Park, 3000 US Highway 17-92 West, Polk County, Haines City, Florida. RP Village2 was dissolved effective September 25, 2015. Defendant Asset Investors Operating Partnership, L.P. was the managing member of RP Village2.

41.   RP Village2 is the "mobile home park owner" of Royal Palm Village Mobile Home Park as defined by § 723.003(13), *Fla. Stat.,* which includes an "owner" or

"operator." RP Village2 is also an "operator" of Royal Palm Village Mobile Home Park as defined by § 723.003(16), *Fla. Stat.,* as "a person who has been delegated the authority to act as the park owner in matters relating to the administration and management of the mobile home park, including, but not limited to, authority to make decisions relating to the mobile home park." RP Village2 is a "person" as defined by §1.01(3), *Fla. Stat.*, to include: "… individuals, children, firms, associations, joint adventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations, and all other groups or combinations." "The singular includes the plural and vice versa." §1.01(1), *Fla. Stat.*

### 4.2.9   American Land Lease, Inc. ("ALL")

42.     Defendant American Land Lease, Inc. ("ALL"), is a foreign (Delaware) corporation and was also engaged in business at Royal Palm Village Mobile Home Park, 3000 US Highway 17-92 West, Polk County, Haines City, Florida. ALL was dissolved effective September 25, 2015.

43.     ALL was the "mobile home park owner" of Royal Palm Village Mobile Home Park as defined by § 723.003(13), *Fla. Stat.,* which includes an "owner" or "operator." ALL was also an "operator" of Royal Palm Village Mobile Home Park as defined by § 723.003(16), *Fla. Stat.,* as "a person who has been delegated the authority to act as the park owner in matters relating to the administration and management of the mobile home park, including, but not limited to, authority to make decisions relating to the mobile home park." ALL was a "person" as defined by §1.01(3), *Fla. Stat.*, to include: "… individuals, children, firms, associations, joint adventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations, and all other groups or combinations." "The singular includes the plural and vice versa." §1.01(1), *Fla. Stat.*

### 4.2.10  Asset Investors Operating Partnership, L.P. ("AIOP")

44.     Defendant Asset Investors Operating Partnership, L.P., ("AIOP"), is a foreign (Michigan) limited partnership and is engaged in business at Royal Palm Village Mobile Home Park, 3000 US Highway 17/92 West, Polk County, Lakeland, Florida. AIOP is the managing member of Defendant RP Village. AIOP was the managing member of RP Village2.

45.     AIOP is the "mobile home park owner" of Royal Palm Village Mobile Home Park as defined by § 723.003(13), *Fla. Stat.,* which includes an "owner" or "operator." AIOP is also an "operator" of Royal Palm Village Mobile Home Park as defined by § 723.003(16), *Fla. Stat.,* as "a person who has been delegated the authority to act as the park owner in matters relating to the administration and management of the mobile home park, including, but not limited to, authority to make decisions relating to the mobile home park." AIOP is a "person" as defined by §1.01(3), *Fla. Stat.*, to include: "… individuals, children, firms, associations, joint adventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations, and all other groups or combinations." "The singular includes the plural and vice versa." §1.01(1), *Fla. Stat.*

### 4.2.11  Richard Lee ("Lee")

46.     Defendant Richard Lee ("Lee") is an individual who currently resides in Leon County, Florida. Lee is a licensed Florida lawyer since 1980, a partner and/or an employee or shareholder of Defendant Lutz, Bobo & Telfair, P.A., d/b/a Lutz, Bobo, Telfair, Eastman & Lee, 2155 Delta Blvd., Suite 201B, Tallahassee, Florida. Lee, a partner and/or principal of Lutz Bobo Law Firm, is a founding or participating member.

### 4.2.12  Lutz, Bobo & Telfair, P.A. ("Lutz Bobo Law Firm")

47.     Defendant Lutz, Bobo & Telfair, P.A. ("Lutz Bobo Law Firm"), d/b/a Lutz, Bobo, Telfair, Eastman & Lee, f/k/a Lutz, Webb & Bobo, P.A., is a Florida corporation which operates in Leon County, Florida at 2155 Delta Blvd., Suite 201B,

Tallahassee, Florida and in Sarasota County, Florida at One Sarasota Tower, Two North Tamiami Trail, Fifth Floor, Sarasota, Florida. Lutz Bobo Law Firm is a founding member. Lutz Bobo Law Firm is a "person" as defined by §1.01(3), *Fla. Stat.*, to include: "…individuals, children, firms, associations, joint adventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations, and all other groups or combinations." "The singular includes the plural and vice versa." §1.01(1), *Fla. Stat.*

**5.0     Class Representation Allegations**

48.     Plaintiffs bring this class action on behalf of themselves individually and all others similarly situated, pursuant to *Fed. R. Civil P.* 23.

49.     The proposed Class consists of all persons who are or were mobile homeowners in the Royal Palm Village Mobile Home Park from 2009 to the present and were victimized by Defendants' fraudulent and conspiratorial acts since 2015 to illegally and unreasonably deceive over 400 elderly mobile home owners and the Royal Palm Village Residents, Inc., that their mobile home park was lawfully purchased by the Defendants. Subsequently, the Defendants acted and conspired to circumvent statutory regulations under the Florida Mobile Home Act and engaged in further deceit and extortion:

- passing-on increased ad valorem taxes (resulting from the premium purchase price for the Park) to the elderly mobile home owners;

- illegally passed-on their annual fire and stormwater tax using only the 300 occupied lots instead of using all of the 396 permitted lots and the clubhouse, exercise room, maintenance building and office;

- lot rental categories (water, preserve, oversize) were actually discriminatory unreasonable lot rental increases; "water" was really retention pond. "Preserve" was really raw wetlands or scrub land—with associated premium lot rents;

- deceived and compelled the Royal Palm Village Residents, Inc., to enter into an oppressive and illegal five year lot rental agreement;

- Defendants promised to spend $1,000,000 on maintenance, repair, and replacement of roads, seawalls and common areas as an inducement to enter into the five year lot rental agreement;

- Defendants Lee and Lutz Bobo Law Firm misrepresented the legal effect of the five year agreement to cause DBPR to withdraw the Royal Palm Village Residents, Inc.'s grant of mediation

- misleading mobile home owners that the Park clubhouse and facilities are ADA compliant;

- extorted and intimidated the Royal Palm HOA and the elderly mobile homeowners to withdraw their complaints.

50.    The Class includes those Plaintiffs who have been forced or expect to be forced to be fraudulently required to pay increased lot rental as a result of the imposition or change in "premium" (water, preserve, etc.) lot rental categories.

51.    The Class includes those Plaintiffs who have suffered retaliation or expect to suffer retaliation by the Defendants as a result of their and the Royal Palm HOA's:

> (a)    good faith complaints to a governmental agency charged with responsibility for enforcement of a building, housing, or health code of a suspected violation applicable to the mobile home park;
>
> (b)    organization, encouragement, or participation in the Royal Palm HOA; or
>
> (c)    complaints to the Defendants for the Defendant-park owners' failure to comply with §723.022, *Fla. Stat*.

52.    The Class includes those Plaintiffs who have paid higher lot rental and the excessive ad valorem pass-ons or who received threats of liens or eviction or restrictions of their use of Park facilities or amenities for their nonpayment.

53.    The Class includes those elderly and disabled Plaintiff homeowners who have suffered the deprivation or expect to suffer the deprivation of a handicap accessible Park clubhouse, facilities, and common areas.

54.     Excluded from the Class are Defendants, their affiliates, employees, officers and directors, persons or entities that market or sell homes in Royal Palm Village Mobile Home Park, the judge(s) assigned to this case, and the attorneys of record in this case. Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

55.     This action is properly brought as a class action because:

(a)     The proposed Class is so numerous and geographically dispersed throughout the United States and Canada that the joinder of all Class Members is impracticable. The number of Class members is approximately 400 persons, and is expected to grow as homes in Royal Palm Village Mobile Home Park are resold. Many of the Class Members are seasonal residents of Florida and reside in other portions of the United States and Canada during the remainder of the year;

(b)     The disposition of Plaintiffs' and proposed Class Members' claims in a class action will provide substantial benefits to both the parties and the Court;

(c)     The proposed Class is ascertainable and there is a well-defined community of interest in the questions of law or fact alleged herein since the rights of each proposed Class Member were infringed or violated in the same or similar fashion and uniform manner;

(d)     There are questions of law and fact common to the proposed Class which predominate over any questions that may affect particular Class Members. Such common questions of law and fact include but are not limited to:

1.     Whether Defendants violated 18 U.S.C. § 1962;

2.     Whether Defendants violated Title 3 of the ADA - 42 U.S.C. § 12181 *et seq.*;

3.     Whether Defendants violated the Florida Mobile Home Act, Chapter 723, *Fla. Stat.*;

4.      Whether Defendants violated the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Part II, Chapter 501, *Fla. Stat.*;

5.      Whether Plaintiffs and Class Members have been harmed and the proper measure of relief;

6.      Whether Plaintiffs and Class Members are entitled to an award of treble damages, punitive damages, attorneys' fees and costs; and

7.      Whether, Plaintiffs and Class Members are entitled to equitable relief, and if so, the nature of such relief.

(e)     Plaintiffs' claims are typical of the claims of the members of the proposed Class. Plaintiffs and Class Members have been injured by the same wrongful practices of Defendants. Plaintiffs' claims arise from the same practices and conduct that give rise to the claims of all Class Members and are based on the same legal theories;

(f)     Plaintiffs will fairly and adequately protect the interests of the Class in that they have no interests antagonistic to those of the other Class Members, and Plaintiffs have retained an attorney experienced in consumer class actions and complex litigation as counsel;

(g)     A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

1.      Given the size of individual Class Members' claims and the expense of litigating those claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendants committed against them and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

Page 37

2.      This action will promote an orderly and expeditious administration and adjudication of the proposed Class claims, economies of time, effort and resources will be fostered and uniformity of decisions will be insured;

3.      Without a class action, Class Members will continue to suffer damages, and Defendants' violations of law will proceed without remedy while Defendants continue to reap and retain the proceeds of their wrongful conduct; and

4.      Plaintiffs know of no difficulty that will be encountered in the management of this litigation which would preclude class certification.

56.      Defendants and their agents had, or have access to, address information for the Class Members, which may be used for the purpose of providing notice of the class action.

57.      Plaintiffs seek damages, equitable relief, attorneys' fees, and costs on behalf of the Class on grounds generally applicable to the entire proposed Class.

6.0 **The Scheme:**

**Since 2015, the Defendants deceived over 400 elderly mobile home owners and the Royal Palm HOA that their mobile home park was lawfully purchased by the Defendants.**

**Subsequently, the Defendants acted and conspired to circumvent statutory regulations under the Florida Mobile Home Act and engaged in further deceit and extortion:**

58.     In an August 6, 2014 letter to the Royal Palm HOA, ALL President and CEO David Lentz explained that affiliates of Sun Communities agreed as of July 30,2014 to acquire ALL. Sun Communities took over management and operation of the Park on or about January 6, 2015. Tim Bias was Park Manager.

60.     The Defendants conspired to fraudulently represent to the Plaintiff Royal Palm HOA and over 400 elderly homeowners that the purchase of Royal Palm Village Mobile Home Park and had been arranged through a lawful "unsolicited offer" (the consequence of which frustrated the Royal Palm HOA's statutory right of first refusal to match the contract terms and conditions under §723.071(1), *Fla. Stat.*). The Plaintiff Royal Palm HOA and the elderly homeowners learned in March 2019 that the sale of the Park was neither pursuant to an "unsolicited offer" nor otherwise compliant with the requirements §723.071, *Fla. Stat.*

61.     Section 723.071(1), *Fla. Stat.*, required Defendant ALL to notify the Royal Palm HOA that it offered the mobile home park for sale:

(a)     **If a mobile home park owner offers a mobile home park for sale, she or he shall notify the officers of the homeowners' association** created pursuant to ss. 723.075-723.079 of the offer, stating the price and the terms and conditions of sale.

(b)     **The mobile home owners, by and through the association defined in s. 723.075, shall have the right to purchase the park**, provided the home owners meet the price and terms and conditions of the mobile home park owner by executing a contract with the park owner within 45 days, unless agreed to otherwise, from the

date of mailing of the notice and provided they have complied with ss. 723.075-723.079. If a contract between the park owner and the association is not executed within such 45-day period, then, unless the park owner thereafter elects to offer the park at a price lower than the price specified in her or his notice to the officers of the homeowners' association, the park owner has no further obligations under this subsection, and her or his only obligation shall be as set forth in subsection (2).

(c)   If the park owner thereafter elects to offer the park at a price lower than the price specified in her or his notice to the home owners, the home owners, by and through the association, will have an additional 10 days to meet the price and terms and conditions of the park owner by executing a contract.

\*\*\*

Section 723.071(1), *Fla. Stat.* (Emphasis Added)

62.   Section 723.071(3)(b), *Fla. Stat.*, defines an "offer" as "... any solicitation by the park owner to the general public."

63.   Section 723.071(4), *Fla. Stat.*, specifies that the statute does **not** apply to:

(a)   Any sale or transfer to a person who would be included within the table of descent and distribution if the park owner were to die intestate.

(b)   Any transfer by gift, devise, or operation of law.

(c)   **Any transfer by a corporation to an affiliate. As used herein, the term "affiliate" means any shareholder of the transferring corporation; any corporation or entity owned or controlled, direct7ly or indirectly, by the transferring corporation; or any other corporation or entity owned or controlled, directly or indirectly, by any shareholder of the transferring corporation.**

(d)   Any transfer by a partnership to any of its partners.

(e)   Any conveyance of an interest in a mobile home park incidental to the financing of such mobile home park.

(f)   Any conveyance resulting from the foreclosure of a mortgage, deed of trust, or other instrument encumbering a mobile home park or any deed given in lieu of such foreclosure.

Page 40

    (g)    Any sale or transfer between or among joint tenants or tenants in common owning a mobile home park.

    (h)    Any exchange of a mobile home park for other real property, whether or not such exchange also involves the payment of cash or other boot.

    (i)    The purchase of a mobile home park by a governmental entity under its powers of eminent domain.

Section 723.071(4), *Fla. Stat.* (Emphasis Added)

64.    The sale by the Defendants to Sun Communities was neither unsolicited nor an offer to an affiliate of ALL or otherwise exempt from Section 723.071(1), *Fla. Stat.*

**6.1    passing-on increased ad valorem taxes (resulting from the premium purchase price for the Park) to the elderly mobile home owners;**

65.    Plaintiff Royal Palm HOA and the elderly homeowners were damaged by the significant consequent increased annual ad valorem pass-ons associated with the premium purchase Defendants paid for the Park.

**6.2    illegally passed-on their annual fire and stormwater tax using only the 300 occupied lots instead of using all of the 396 permitted lots and the clubhouse, exercise room, maintenance building and office;**

66.    The Defendants illegally passed on their annual fire and stormwater tax using the incorrect denominator of the 300 occupied lots. The Defendants omitted the balance of the 396 permitted lots and the clubhouse, exercise room, maintenance building and office.

**6.3    lot rental categories (water, preserve, oversize) were actually discriminatory unreasonable lot rental increases; "water" was really retention pond. "Preserve" was really raw wetlands or scrub land—with associated premium lot rents;**

68.    The Defendants provided the Plaintiff elderly home owners via United States mail and the Internet <https://www.suncommunities.com/community/royal-palm-village/> the following glowing reports of life at Royal Palm Village Mobile Home Park:

\*\*\*

Manufactured Home Living in Haines City, Florida!

Royal Palm Village 55+ community **welcomes everyone from fishermen to nature enthusiasts with its sparkling lagoons, tranquil canals,** resort-style amenities, and carefree 55+ lifestyle. This scenic, gated retirement community is tucked away from the hustle of the city, yet offers all the relaxing pursuits you seek in Central Florida.

Vacation-style living reigns supreme at Royal Palm Village. This over 55 manufactured home community hosts' resort-style amenities and recreational activities, so you'll never run out of things to do. Residents love taking advantage of our on-site conveniences:

- Swing by our fabulous clubhouse and introduce yourself to your new neighbors

- Head over to the recreation center for an array of leisurely activities

- Hop in the water or relax poolside by our heated swimming pool

- Get fit and stay in shape at our state-of-the-art fitness center

- Looking for some friendly competition? Meet up with friends at the shuffleboard courts or horseshoe pits

- Stay as busy as you'd like with neighborhood activities and community social calendar

\*\*\*

With luxurious amenities, welcoming neighbors, and the friendliest staff in town, it's easy to see why our residents are proud to call Royal Palm Village home.

AMENITIES

Pet Friendly
Dog Park
**Waterfront Sites**
**Street Facing Sites**
**Wooded Sites**
RV Storage
Boat Storage

\*\*\*

69.     The Defendants' lot rental categorization of "water" is false and fraudulent. The Park "water" described on in-park signage as **"venetian canals,"** or in the Defendants' website as **"sparkling lagoons"** or **"tranquil canals,"** are simply retention ponds. During substantial periods of the year those rentention ponds are eyesores and reduce resale values of the Plaintiffs' homes.





70.     Lots categorized as facing "natural preserve" are also false and fraudulent. There are no natural preserves in the vicinity of any such lots; the land falsely attributed to a "natural preserve" is simply ordinary scrublands or wetlands with accumulated rubbish and debris.

71.     In 2016, Defendants Slider and Sun Communities changed the lot rental categories in the Park from standard, corner, and oversized lots to include new "premium" categories. Lots facing or in proximity to a "natural preserve" pay a premium of $59 per month or $708 per year. "Water" lots pay a premium of $93 per month or $1,116 per year.

72.     There are 396 permitted lots in the Park. 260 homeowners pay an average premium of $912 per year or a total of $237,120 for falsely being on "water" or in the proximity of a "natural preserve." Considering that the average residency for a mobile homeowner is ten years, the damages from the false and fraudulent lot rental premium categorization exceeds 2.3 million dollars.

73.     On or about October 15, 2017 Royal Palm HOA President, Board member, and elderly homeowner Jim LeMonnier asked Defendant Slider if Sun Communities owned the areas fraudulently categorized as "natural preserve." Slider replied that Sun Communities owns those grounds, also.

**6.4     deceived and compelled the Royal Palm HOA to enter into an oppressive and illegal five year lot rental agreement;**

74.     On or about September 16, 2015 Defendants RP Village2 deceived the Royal Palm HOA to circumvent the normal statutory disclosure and negotiation process under §723.037, *Fla. Stat.*, and to instead enter into a five year lot rental agreement increasing the lot rental by $16 in 2016, $17 in 2017, $18 in 2018, $19 in 2019 and $20 in 2020.

75.     In paragraph 3 of the agreement, the Defendants caused the agreement to include the following language: "... the Association further agrees to waive any right

to object to said [rental] increases which either the Association or the mobile home owners have under Chapter 723, Florida Statutes, including, but not limited to, the right to petition for mediation and the right to institute civil action in opposition to any of the provisions of this Agreement." This contractual language is clearly prohibited by §723.032(2), *Fla. Stat.*, which reads:  "Any provision in the rental agreement is void and unenforceable to the extent that it attempts to waive or preclude the rights, remedies, or requirements set forth in this chapter or arising under law."

76.     The Royal Palm HOA subsequently met with Defendant Slider in 2017 to discuss issues with the September 2015 Agreement and excessive resulting rent increases. Slider presented the Royal Palm HOA with the 2015 comparable park data which she reportedly used in the 2015 rent negotiations—but never disclosed to the Royal Palm HOA until 2017. Significantly, that previously undisclosed park comparable lot rental data revealed that Defendants had, under the pretense of the "favorable" appearance of the certain increased lot rent, *supra*, manipulated the Royal Palm HOA into signing the 2015 agreement fixing lot rental increase at a significantly higher lot rental than those rents with associated comparable parks.

77.     The previously undisclosed comparable park data clearly demonstrated that the rental increases imposed pursuant to the 2015 agreement are much higher than the parks they used and presented to Royal Palm HOA.

78.     Immediately after the execution of the 2015 agreement by the Royal Palm HOA binding upon all of the homeowners in the Park, Defendants insisted that the Royal Palm HOA withhold disclosure from the other homeowners of the terms of the 2015 agreement on the pretense that the deal was so favorable to the Royal Palm HOA that the Defendants did not want other Sun Communities parks to learn of its execution.

79.     In a July 10, 2015 email to the Royal Palm HOA Slider falsely wrote that: a) the majority of the Park's leases are restricted to the Consumer Price Index; and that the

next rent increase would be an "automatic" increase of $20.

**6.5    Defendants promised to spend $1,000,000 on maintenance, repair, and replacement of roads, seawalls and common areas as an inducement to enter into the five year lot rental agreement;**

80.    In 2015, in an effort to induce the Royal Palm HOA to enter into the five year agreement with the Defendants, then Park manager Tim Bias told the Royal Palm HOA and elderly homeowners that the Defendants would spend $1,000,000 on the repair and upgrade of the clubhouse, facilities, and common areas, including roadways and sea walls.

**6.6    Defendants Lee and Lutz Bobo Law Firm misrepresented the legal effect of the five year agreement to cause DBPR to withdraw the Royal Palm HOA's grant of mediation**

81.    On or about December 14, 2017 the Defendants caused Lee and the Lutz Bobo Law Firm to send a letter via United States mail to the Florida Department of Business and Professional Regulation ("DBPR") with the expressed intent to influence DBPR to dismiss the previously approved Royal Palm HOA mediation over an increase in lot rental amount, resulting lot amount, and reductions in services. Lee and Lutz Bobo Law Firm accused the Royal Palm HOA of  a "clear act of bad faith" and violation of the September 2015 agreement establishing the lot rental amounts for 2016 through 2020. DBPR consequently dismissed the previously approved mediation.

82.    The Defendants, however, misrepresented the legal effect of the five year agreement and failed to inform or remind DBPR of §723.032(2), *Fla. Stat.*, which reads: "**Any provision in the rental agreement is void and unenforceable to the extent that it attempts to waive or preclude the rights, remedies, or requirements set forth in this chapter or arising under law**." (Emphasis Added)

Page 46

**6.7   misleading mobile home owners that the Park clubhouse and facilities are ADA compliant;**

83.     Over a period of years, the Defendants actively misled the Royal Palm HOA and the elderly mobile homeowners that the Defendants were not legally required to ensure that the clubhouse and the park facilities were compliant with the ADA. When asked by the Royal Palm HOA and the Plaintiff homeowners, the Defendants would respond that the clubhouse was not required to comply with the ADA since its construction predated any such legal requirement; ignoring that the Clubhouse and park facilities are public accommodations.

**6.8   extorted and intimidated the Royal Palm HOA and the elderly mobile homeowners to withdraw their complaints;**

84.     On or about August 21, 2018 Woodworth, Lawson, and Sun Communities extorted, and subverted public disclosure of the Scheme by United States and electronic mail. They drafted, co-authored and/or authorized the communication by United States and electronic mail of a hostile, threatening, and extortionate letter to Royal Palm HOA, intending to discourage public discussion in the Park of the Defendants' scheme to circumvent statutory regulations to defraud and exploit elderly mobile home owners with a significantly higher lot rental amount and ad valorem tax pass-on expense.

85.     In their letter to Royal Palm HOA, Woodworth, Lawson, and Sun Communities  purportedly responded to a series of critical assertions by the HOA (including a petition for mediation to address unreasonable lot rental increases, unreasonable resulting lot rental, and a civil theft demand letter required by Chapter 772, *Fla. Stat.*) that Defendants' had illegally imposed an illegal long-term (through 2020) rental agreement upon their 2015 Board of Directors, and illegally opposed the HOA's mediation efforts.

86.     Woodworth, Lawson, and Sun Communities wrote that the Royal Palm

HOA's insistence that the Defendants had engaged in illegal behavior marked the end of

any communication with the Royal Palm HOA:

***

**Your letter has terminated any cooperation with you, with any board member who approved the letter, and with your association**. We will not be falsely accused of stealing from our valued residents. Unless and until you retract the charges made in your August 13, 2018 letter and correctly confirm that the charges had no basis, **we will have no further dealings or communications with you, with your board, or with your association, other than as required by law**.

... Any scheduled or periodic meetings are hereby canceled. **Community Management has instructions to avoid operational communications with you, your board, and your association**. Communications have value only when they are productive and made in good faith. The charges in your letter are neither. They reflect a total disregard of the efforts being made to have a productive relationship.

***

(Emphasis Added)

87.     Woodworth, Lawson, and Sun Communities further informed the Royal

Palm HOA inaccurately and improperly that the HOA will lose that legal challenge and

pay the Defendants' attorney's fees:

***

Further, the "unreasonable rents" you claim were stolen were the actual amounts plainly agreed upon in the Long Term Agreement. We remind you that the Long Term Agreement provides:

(3) Waiver of Claims. The Association's negotiating committee, on behalf of the Association and the home owners within Royal Palm Village, hereby consent to the above increases in the monthly base rent, and the **Association further agrees to waive any right to object to said increases which either the Association or the mobile home owners have under Chapter 723, Florida Statutes , including but not limited to, the right to petition for mediation and the right to institute civil action in opposition to any of the provisions of this Agreement.**

Page 48

> **That binding contract will be upheld. Paragraph ten (10) will give Sun an
> additional right to recover its attorneys' fees in the event the Long Term
> Agreement is challenged.**

(Emphasis Added)

88.     Woodworth, Lawson, and Sun Communities  accused the Royal Palm
HOA—a board of elderly non-lawyers—of advancing "ridiculous claims" for which
Defendants would seek sanctions:

***

> **We will seek sanctions against your association, and anyone involved in
> advancing the ridiculous claims.**

***

(Emphasis Added)

89.     But, in fact, the prior 2015 agreement was in violation of two express
provisions of the Florida Mobile Home Act:

- §723.031(1) - which mandates that a lot rental agreement may not
  contain any rule or regulation prohibited by or inconsistent with the
  Florida Mobile Home Act; and
-  §723.032(2) which declares that any provision in the lot rental
  agreement is void and unenforceable to the extent that it attempts to
  waive or preclude the rights, remedies, or requirements set forth in the
  Florida Mobile Home Act or arising under law.

90.     On or about November 12, 2018 Woodworth, Lawson, and Sun
Communities again extorted, and subverted public disclosure of the Scheme by
United States and electronic mail. They drafted, co-authored and/or authorized the
communication by United States and electronic mail of a hostile, threatening, and
extortionate letter to Royal Palm HOA, intending to discourage public discussion in the
Park of the illegal and fraudulent scheme in which the Defendants seek to circumvent

Page 49

statutory regulations to defraud and exploit elderly mobile home owners with a significantly higher lot rental amount and ad valorem tax pass-on expense:

>                             ***
>
> Sun Communities values an open, productive relationship with the Homeowners Associations in its communities. That relationship exists in every other Sun Community. However, it can only exist when the communications are mutually intended for the betterment of the community.
>
> **On August 13, 2018, you forwarded an utterly false and libelous letter accusing Sun Communities of stealing from our valued residents.**
>
> **If Royal Palm Village Residents Inc. rescinds the letter of August 13, 2018, we would be more than willing to commence communication with the Board.**
>
>                             ***

(Emphasis Added)

### 6.9    Plaintiffs-homeowner scenarios: representative examples of Defendants' false statements and fraudulent omissions

### 6.9.1    Beverley and Dave Davies, Lot 113

91.      In 2004 my husband bought the home at Lot 113.  At the time the rent was $340.00 (which was the standard lot price) and soon after we locked in at $370.00 per month and of course that is what we were paying since then. Every year we would receive notice that our rent continued to be $370.00 without any notification of any increases in the other standard lots. Much to our surprise in 2016 when we listed our home privately, we were told that our standard lot designation had been changed to a preservation lot designation because we have a forested area behind us. We had no previous notification.

The forested land is not a preservation as far as I am concerned as it has a sink hole, is a wet area and is full of garbage. No one takes care of it. I personally kept the overgrowth of weeds and vegetation at the lot edge under control by cutting it myself. I made an appointment to discuss the change in designation with Belinda.  To this meeting

I took pictures of the garbage in among the trees and she stated that the garbage had been from the hurricane and the maintenance crew had not been out there to clean it up.  (The garbage is still there today). Belinda Lawson told me my lot rent would be over $600.00 per month due to changing the status of my property. Until then I had never been told that the status would be changed. As far as she was concerned the designation would of preserve lot would remain the same.

Consequently, whenever anyone came to look at my property, they were turned off to find the rent price to be over $600.00 and would walk away. In 2017 we listed our property with an outside real estate agent from March till September. She told us that anyone that inquired about it was turned off when they found out what the rent was and that we needed to lower the price in order to get it sold. We paid $11,000.00 for it in 2004, put $20,000.00 into it in renovations and were trying to sell it with everything included for $22,900.00.  How could we reduce it anymore? We tried listing privately in Nov. 2018 with still the same results.

The property  beside mine is still listed as a standard lot because there is an open field behind it which is used for parking for clubhouse events.  No one is ever going to build there so why is their property not designated differently? I don't see anything fair about this.

### 6.9.2   Ken and Brenda Morgan, Lot 281

92.     My home is under the preserve lot rent. We actually back up to a canal and the reserve is across the canal and sits directly behind the pallet plant. I think it would cost me more to be considered on the water. RPV cuts the grass on about 5 ft of the shore of the preserve.

### 6.9.3   Harry and Joanne Rush, Lot 35

93.    Mr. Perry, I have found the following ADA Deficiencies at Royal Palm Village:

1.    Pools must have individual pool lifts (hydraulic or water) installed in accordance with ADA regulations for the physically disabled to enter/exit the pool;

2.    Hot tub must have individual pool lift (hydraulic or water) installed in accordance with ADA regulations for the physically disabled to enter/exit the pool area;

3.    All pool decks must be wheelchair accessible;

4.    Gates for the pool decks must be installed in such a manner that will allow wheelchair users the ability to enter/exit the pool decks without assistance;

5.    Entrance to gym must be equipped with automated electric doors to allow wheelchair entry/exit without assistance;

6.    Electric Entry/Exit pads for Automated Doors must be installed in an area that is easily accessible and not in a location that will cause a  wheelchair user difficulty in gaining access to the facility;

7.    Community Center should be equipped with additional automated electric doors and entry/exit pads in the event of an emergency evacuation;

8.    A wheelchair ramp to the stage should be constructed and installed according to local building codes to allow wheelchair access for the disabled to participate in numerous Community activities;

9.    Designated Wheelchair Parking Spaces at Pool/gym must be re-drawn and re-painted in accordance with ADA regulations to allow

        for a proper wheelchair loading/unloading

10.    The bathrooms (actual stalls) were re-configured for handicap accessibility during the remodeling phase approximately 2 years ago, however the actual doors to enter/exit the women's washroom is impossible for a wheelchair individual to open from the inside without assistance. An automated electric door would eliminate this problem for both Men's/Women's washrooms.

The physical effect of all these deficiencies that I have listed is obvious. The mental aspect though is never thought about, the

- onset of depression;

- anxiety;

- exclusion from activities; and

- feeling of worthlessness;

all contribute to the mental well-being and health of a handicap person.

Personally, I believe what Sun Communities is doing by not providing items under the ADA is criminally negligent. It's a clear cut case of discrimination. A handicap individual should be afforded all the same accessibilities as a non-handicapped person under the ADA. Sun Communities is not providing these protections, ignoring regulations and therefore negligent.  So many handicapped individuals cannot access the facilities due to Sun Communities' continuing negligence, yet they pay full price for those facilities through their monthly Lot Rent. They are not afforded the opportunity to opt out for a lower monthly rent.

I have discussed all of the above with every Park Manager since I've lived here (2011). The common answer always was and still is that we're waiting for corporate to respond. No physical correspondence has ever existed between myself and the Park Managers. After 3 years of waiting for change that never came, I bought a portable ADA

certified pool lift for my wife to use.

One more common thread mentioned over the years is that as a private entity they are not required to follow the ADA, yet the Park is open to the public year round. They sell/rent/lease homes to the public 365 days of the year, so how can they claim to be a private entity?

### 6.9.4   Stephen Hines, Lot 553

94.      In June of 2017, Stephen Hines, Lot# 553 asked the park manager to re-evaluate his lot rent amount as he did not feel that it should be classified as a water lot for rent purposes as his home has a land buffer (public access/common area) which is maintained by the park and lies between his home and a nearby retention pond. He received a response on July 3 informing him that his request was rejected as his lot was clearly on the water. Besides the obvious argument that his lot does not touch the water, part of the rationale behind his request is that there are other homes in the park clearly on the water that do not pay water rates. If you look at the map, you will see lot #288 which is now classified as a preserve lot by the owner when it was a water lot when owned by the previous occupant. This is a lot with over 80 feet of canal frontage with a very nice seawall yet it is not considered a water lot by the owner yet Mr. Hines's lot is.

### 6.9.5   Laurie Skemp, Lot 264

95.      Laurie Skemp, Lot 264, Seawall issues – Laurie Skemp found serious safety issues with her seawall which have been reported several times and they put in a temporary fix at one time. She also experienced a large amount of damage to her home during one of the many water breakages. She prepared the following timeline for seawall/ hole:

Sept.11, 2017 – Returned from Lake Mary, FL after evacuating for Hurricane Irma. Walked around the perimeter of my property to assess for damage. While walking around the water-facing side of the property (about 5 feet from the seawall) my right leg sunk into the ground up to knee level, landing in a pool of water. Since it was later afternoon, I decided to go to the Sun Communities' office the next morning and talk to/inquire of Belinda Lawson what needed to be done.

Sept. 12, 2017 – Informed Belinda that as I was walking the water side of the community I sunk knee deep into a water-filled hole. I also mentioned that after I pulled my leg out, I walked the immediate vicinity of the hole and found other weak spots. She informed me that many properties In the area had the same problem, some so bad that the holes were up to the house. She said Sun Communities engineers was "working" on possible solutions to the problem. Her suggestion to me: stay away from the area. No indication as to when the situation was addressed.

Nov. 3, 2017 – Stopped Belinda as she was driving by, showed her the "hole" and wall, she said Sun would be sending out engineers after the first of the year to evaluate all the seawalls and they would be assessing/formulating a plan to rectify the situation. She indicated that they would most likely be replacing the walls with berms.

Nov. 11, 2017 – Walked to the yard to do some landscaping and sunk

further into the hole.

Nov. 12, 2017 – Jason was here to do a side job on light switch and I showed

him the seawall. He stepped into the hole, enlarging it to

show a concrete slab, and then he progressed to pull some

concrete chunks placed by the seawall. He stressed that he

would address the situation with Belinda because the dirt

would continue to wash away, allowing the hole to enlarge

and come closer to the house.

Nov. 20, 1017 – No action from Belinda or Jason as of yet. (photos taken)

Dec. 14, 2017 – Belinda phoned and said someone would be dropping

1/2 load of dirt that they would use to fill the hole. Jason

arrived and started removing the concrete chunks and

rotten wood and plywood. Using a wench, he pulled the

wall toward the house and then, using a boat, he went on

the water side to pound in a beam vertically to the outside

of the wall to support the weakest area. He and Jamal

then filled in the empty spots by the seawall, as well as the

hole, with the dirt. He said it would "rectify" the situation

but that it would not solve the initial problem. At the end

of the work day, he showed Belinda what had been done,

indicating that the solution was "temporary", and she

agreed. They also determined that the "concrete drainage

slope" on the western side of the wall would have to be

addressed. (photos of "work in progress"taken on 12/14,

photos of completed work taken on 12/16))

Page 56

Jan. 27, 2018 – As of today, have not seen any Sun engineers in the area.





### 6.10    Mail and Wire Fraud

96.    On or about August 21, 2018 Woodworth, Lawson, and Sun Communities extorted, and subverted public disclosure of the Scheme by United States and electronic mail. They drafted, co-authored and/or authorized the communication by United States and electronic mail of a hostile, threatening, and extortionate letter to Royal Palm HOA, intending to discourage public discussion in the Park of the Defendants' scheme to circumvent statutory regulations to defraud and exploit elderly mobile home owners with a significantly higher lot rental amount and ad valorem tax pass-on expense.

97.    In their letter to Royal Palm HOA, Woodworth, Lawson, and Sun Communities purportedly responded to a series of critical assertions by the HOA (including a petition for mediation to address unreasonable lot rental increases and a civil theft demand letter required by Chapter 772, *Fla. Stat*.) that Defendants' had illegally imposed or changed lot rental categories, imposed an illegal long-term (through 2020) rental agreement upon their 2015 Board of Directors, and illegally opposed the HOA's mediation efforts.

98.    Woodworth, Lawson, and Sun Communities wrote that the Royal Palm HOA's insistence that the Defendants had engaged in illegal behavior marked the end of any communication with the Royal Palm HOA:

***

> **Your letter has terminated any cooperation with you, with any board member who approved the letter, and with your association**. We will not be falsely accused of stealing from our valued residents. Unless and until you retract the charges made in your August 13, 2018 letter and correctly confirm that the charges had no basis, **we will have no further dealings or communications with you, with your board, or with your association, other than as required by law**.

... Any scheduled or periodic meetings are hereby canceled. **Community Management has instructions to avoid operational communications with you, your board, and your association**. Communications have value only when they are productive and made in good faith. The charges in your letter are neither. They reflect a total disregard of the efforts being made to have a productive relationship.

***

(Emphasis Added)

99.    Woodworth, Lawson, and Sun Communities further informed the Royal

Palm HOA inaccurately and improperly that the HOA will lose that legal challenge:

***

Further, the "unreasonable rents" you claim were stolen were the actual amounts plainly agreed upon in the Long Term Agreement. We remind you that the Long Term Agreement provides:

> (3) Waiver of Claims. The Association's negotiating committee, on behalf of the Association and the home owners within Royal Palm Village, hereby consent to the above increases in the monthly base rent, and the Association further agrees to waive any right to object to said increases which either the Association or the mobile home owners have under Chapter 723, Florida Statutes , including but not limited to, the right to petition for mediation and the right to institute civil action in opposition to any of the provisions of this Agreement.

**That binding contract will be upheld. Paragraph ten (10) will give Sun an additional right to recover its attorneys' fees in the event the Long Term Agreement is challenged.**

(Emphasis Added)

100.    Woodworth, Lawson, and Sun Communities  accused the Royal Palm

HOA—a board of elderly non-lawyers—of advancing "ridiculous claims" for which

Defendants would seek sanctions:

***

**We will seek sanctions against your association, and anyone involved in advancing the ridiculous claims.**

***

Page 59

(Emphasis Added)

101.    But, in fact, the prior 2015 agreement was in violation of two express

provisions of the Florida Mobile Home Act:

- §723.031(1) - which mandates that a lot rental agreement may not
  contain any rule or regulation prohibited by or inconsistent with the
  Florida Mobile Home Act; and

- §723.032(2) which declares that any provision in the lot rental
  agreement is void and unenforceable to the extent that it attempts to
  waive or preclude the rights, remedies, or requirements set forth in the
  Florida Mobile Home Act or arising under law.

102.    On or about November 12, 2018 Woodworth, Lawson, and Sun

Communities again extorted, and subverted public disclosure of the Scheme by

United States and electronic mail. They drafted, co-authored and/or authorized the

communication by United States and electronic mail of a hostile, threatening, and

extortionate letter to Royal Palm HOA, intending to discourage public discussion

in the Park of the illegal and fraudulent scheme in which the Defendants scheme to

circumvent statutory regulations to defraud and exploit elderly mobile home owners with

a significantly higher lot rental amount and ad valorem tax pass-on expense:

*** 

> Sun Communities values an open, productive relationship with the
> Homeowners Associations in its communities. That relationship exists
> in every other Sun Community. However, it can only exist when the
> communications are mutually intended for the betterment of the community.
>
> **On August 13, 2018, you forwarded an utterly false and libelous letter
> accusing Sun Communities of stealing from our valued residents.**
>
> **If Royal Palm Village Residents Inc. rescinds the letter of August 13,
> 2018, we would be more than willing to commence communication with
> the Board.**

Page 60

***

(Emphasis Added)

103.   Defendants (and their co-conspirators/agents) engaged in a scheme to unlawfully defraud Plaintiffs of their money or property through the fraudulent scheme to circumvent statutory regulations to defraud and exploit elderly mobile home owners.  Defendants (and their co-conspirators/agents) knowingly devised or knowingly participated in a scheme or artifice to defraud Plaintiffs or to obtain the money or property of Plaintiffs by means of false or fraudulent pretenses, representations, material omissions, or promises.

104.   Defendants (and their co-conspirators/agents) could foresee that the U.S. Postal Service and interstate wires would be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in or carrying out the scheme, within the meaning of 18 U.S.C. §§ 1341 and 1343.

105.   In particular, Defendants (and their co-conspirators/agents) knew or could foresee that the U.S. Postal Service and interstate wires would be used to receive and/or deliver, *inter alia,* the increased lot rental notices, including improper annual fire and stormwater taxes, used by the Defendants which incorporated fraudulent representations regarding the Plaintiffs' legal right to change or impose lot rental categories, invoices for payment of increased lot rental and payment of excessive ad valorem tax pass-ons from the sale and purchase of the Park.

106.   Defendants (and their co-conspirators/agents) acting singly and in concert, personally or through their agents, used the U.S. Postal Service and interstate wires or caused the U.S. Postal Service or interstate wires to be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in, or carrying out a scheme to defraud the Plaintiffs within the meaning of 18 U.S.C. §§ 1341 and 1343.

107.   It is not possible for Plaintiffs to plead with particularity all instances

of mail and wire fraud that advanced, furthered, executed, and concealed the scheme because the particulars of many such communications are within the exclusive control and within the exclusive knowledge of Defendants (and their co-conspirators/agents) other presently unknown individuals.

108.    By way of example, however, Defendants (and their co-conspirators/ agents) specifically used the U.S. Postal Service or interstate wires or caused the U.S. Postal Service or interstate wires to deliver each and every telephone call, email, and letter described in paragraphs 96-113.

109.    Upon information and belief, some of the wire communications described above occurred between persons in the same state but crossed interstate borders by reason of the technology and other mechanisms used to transmit the communication.

110.    Each and every use of the U.S. Postal Service or interstate wires described above was committed by Defendants and their co-conspirators/agents with the specific intent to defraud Plaintiffs or for obtaining the money or property of Plaintiffs by means of false or fraudulent pretenses, representations, material omissions or promises. Defendants and their co-conspirators'/agents' acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 constitute racketeering activity as defined by 18 U.S.C. § 1961(1)(B) or "criminal activity" as defined by *Fla. Stat.* § 772.102(b).

111.    Plaintiffs purchased their mobile homes and entered into a long-term lot rental agreement not knowing that the Defendants fraudulently imposed or changed lot rental categories, and they were forced to pay a higher lot rental, ad valorem tax pass-on, and suffer significant reduction in their resale value.

112.    Defendants' scheme to defraud was designed to victimize elderly homebuyers. As such, Defendants intended to take advantage of Plaintiffs' perceived ignorance or gullibility and intended to prey on Plaintiffs' infirmities.

113.    Defendants' scheme further deprives the Plaintiffs of their intangible right

to honest services under The Florida Mobile Home Act, in which the mails were caused to be used to defraud and deceive the Plaintiffs through materially false and fraudulent misrepresentations and omissions. The Plaintiffs and Defendants have a trusting relationship in which one party acts for the benefit of another and induces the trusting party to relax the care and vigilance which it would ordinarily exercise. The relationship need not be a formal, or classic, fiduciary relationship. Rather, courts have concluded that 18 U.S.C. §§ 1341 and 1346 similarly reach those who assume a comparable duty of loyalty, trust, and confidence, the material breach of which, with the intent to defraud, deprives the victim of the intangible right to honest services. *U.S. v. Milovanovic*, 678 F.3d 713 (9th Cir. 2012), *cert. den.*, 568 U.S. 1126 (2013).

**6.11    Extortion**

114.    Defendants obstructed, delayed, or affected commerce and/or the movement of articles or commodities in commerce, by extortion or attempted or conspired to do so in violation of 18 U.S.C. § 1951.

115.    Defendants maliciously threatened an injury to Plaintiffs' property or reputation with intent thereby to extort money or pecuniary advantage or with intent to compel Plaintiffs to act or refrain from acting against their will in violation of *Fla*. *Stat*. § 836.05.

116.    On or about August 21, 2018 Woodworth, Lawson, and Sun Communities extorted, and subverted public disclosure of the Scheme by United States mail. They drafted, co-authored and/or authorized the communication by United States mail of a hostile, threatening, and extortionate letter to Royal Palm HOA, intending to discourage public discussion in the Park of the illegal and fraudulent scheme in which the Defendants imposed or changed lot rental categories with a significantly higher lot rental amount and ad valorem tax pass-on expense.

117.     In their letter to Royal Palm HOA, Woodworth, Lawson, and Sun Communities  purportedly responded to a series of critical assertions by the HOA (including a petition for mediation to address unreasonable lot rental increases and a civil theft demand letter required by Chapter 772, *Fla. Stat*.) that Defendants′ had illegally imposed or changed lot rental categories, imposed an illegal long-term (through 2020) rental agreement upon their 2015 Board of Directors, and illegally opposed the HOA′s mediation efforts.

118.     Woodworth, Lawson, and Sun Communities informed the Royal Palm HOA that the HOA′s insistence that the Defendants had engaged in illegal behavior marked the end of any communication with the Royal Palm HOA:

*** 

> **Your letter has terminated any cooperation with you, with any board member who approved the letter, and with your association. We will not be falsely accused of stealing from our valued residents. Unless and until you retract the charges made in your August 13, 2018 letter and correctly confirm that the charges had no basis, we will have no further dealings or communications with you, with your board, or with your association, other than as required by law.**
>
> **… Any scheduled or periodic meetings are hereby canceled. Community Management has instructions to avoid operational communications with you, your board, and your association**. Communications have value only when they are productive and made in good faith. The charges in your letter are neither. They reflect a total disregard of the efforts being made to have a productive relationship.

*** 

(Emphasis Added)

119.     Woodworth, Lawson, and Sun Communities further informed the Royal Palm HOA inaccurately and improperly that the HOA will lose that legal challenge:

***

Further, the "unreasonable rents" you claim were stolen were the actual amounts plainly agreed upon in the Long Term Agreement. We remind you that the Long Term Agreement provides:

> (3) Waiver of Claims. The Association's negotiating committee, on behalf of the Association and the home owners within Royal Palm Village, hereby consent to the above increases in the monthly base rent, and the Association further agrees to waive any right to object to said increases which either the Association or the mobile home owners have under Chapter 723, Florida Statutes , including but not limited to, the right to petition for mediation and the right to institute civil action in opposition to any of the provisions of this Agreement.

> **That binding contract will be upheld. Paragraph ten (10) will give Sun an additional right to recover its attorneys' fees in the event the Long Term Agreement is challenged.**

(Emphasis Added)

120.    Woodworth, Lawson, and Sun Communities  accused the Royal Palm HOA—a board of elderly non-lawyers—of advancing "ridiculous claims" for which Defendants would seek sanctions:

***

> **We will seek sanctions against your association, and anyone involved in advancing the ridiculous claims.**

***

(Emphasis Added)

121.    But, in fact, the prior 2015 agreement was in violation of two express provisions of the Florida Mobile Home Act:

- §723.031(1) - which mandates that a lot rental agreement may not contain any rule or regulation prohibited by or inconsistent with the Florida Mobile Home Act; and

- §723.032(2) which declares that any provision in the lot rental agreement is void and unenforceable to the extent that it attempts to

Page 65

waive or preclude the rights, remedies, or requirements set forth in the

Florida Mobile Home Act or arising under law.

122     On or about November 12, 2018 Woodworth, Lawson, and Sun

Communities again extorted, and subverted public disclosure of the Scheme by

United States and electronic mail. They drafted, co-authored and/or authorized the

communication by United States and electronic mail of a hostile, threatening, and

extortionate letter to Royal Palm HOA, intending to discourage public discussion in the

Park of the illegal and fraudulent scheme in which the Defendants imposed or changed lot

rental categories with a significantly higher lot rental amount and ad valorem tax pass-on

expense:

*** 

Sun Communities values an open, productive relationship with the
Homeowners Associations in its communities. That relationship exists
in every other Sun Community. However, it can only exist when the
communications are mutually intended for the betterment of the community.

**On August 13, 2018, you forwarded an utterly false and libelous letter
accusing Sun Communities of stealing from our valued residents.**

**If Royal Palm Village Residents Inc. rescinds the letter of August 13,
2018, we would be more than willing to commence communication with
the Board.**

***

(Emphasis Added)

123.     In 2002 Defendant Lee was sued in Osceola County, Florida by 41 elderly

and/or disabled homeowners for violations of the Florida RICO and Florida RICO

Conspiracy, Chapter 895, *Fla. Stat.*, Theft and Civil Remedies for Theft, §§812.014,

812.035, and 772.104, *Fla. Stat.*, and Florida Deceptive and Unfair Trade Practices

Act, Chapter 501, *Fla. Stat.* The amended complaint alleged that on January 11, 2002

the defendants caused their attorney and agent, Lee, to come to the Park to extort the

plaintiffs into abandoning their efforts to file suit in this cause, in violation of §§ 812.014, 836.05 and Chapter 895, *Fla. Stat.* Defendant Lee, at the request of the Park Owner, addressed the Plaintiffs and other individual home owners in the Park strongly urging them to abandon their plans for litigation. In the process of addressing the home owners, Defendant Lee purported to give the assembled home owners "legal advice" that their anticipated lawsuit had no chance of success and that the home owners would be forced to compensate the Park Owner it's substantial attorney fees. Numerous residents expressed to Defendant Lee that they felt his presence was an attempt to intimidate and frighten them. The case was settled and dismissed in February 2003.

**7.0    Claims**

**7.1    Count One – RICO; Racketeer Influenced and Corrupt Organizations Act**
Violation of 18 U.S.C. § 1962(c) – *Fla. Stat.* § 772.103(3) by Defendants Slider, Woodworth, Lawson, and Lee

### 7.1.1    *Slider-Woodworth-Lawson-Lee Enterprise*

124.    Plaintiffs reallege and restate paragraphs 1 through 123.

125.    Slider, Woodworth, Lawson, and Lee constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c) and *Fla. Stat.* §§ 772.102(3) & 772.103(3), in that they were "a group of individuals associated in fact" (hereinafter referred to as the "*Slider-Woodworth-Lawson-Lee Enterprise*").

    a.    Slider, Woodworth, Lawson, and Lee shared the common purposes of developing Royal Palm Village Mobile Home Park and defrauding Plaintiffs of money or property through the fraudulent increased lot rental, including ad valorem pass-ons, and other taxes, and from premium lot rental categories.

    b.    Slider, Woodworth, Lawson, and Lee were related in that they are business partners and/or associates and owed to Plaintiffs a duty of

good faith and fair dealing under § 723.021, *Fla. Stat.*

    c.    The *Slider-Woodworth-Lawson-Lee Enterprise* possessed sufficient longevity for the members to carry out their purpose(s) in that the *Slider-Woodworth-Lawson-Lee Enterprise* existed from 2009 through 2019 (at a minimum).

    d.    Slider, Woodworth, Lawson, and Lee are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c) and *Fla. Stat.* § 772.103, who individually conducted, participated in, engaged in, and operated and managed the affairs of the *Slider-Woodworth-Lawson-Lee Enterprise* through a pattern of racketeering activity or criminal activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c) and *Fla. Stat.* §§ 772.102(1), 772.102(4) & 772.103(3). The pattern of racketeering activity or criminal activity consisted of, but was not limited to, the acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343 and *Fla. Stat.* §§ 772.102(1)(b) (described in paragraphs 96 to 113), and extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as described in paragraphs 114 to 123).

**7.1.2**    **Alternative 1: *Sun Communities Enterprise***

126.    In the alternative to paragraph 125, between 2009 and 2019 (at a minimum), Sun Communities constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c) and *Fla. Stat.* §§ 772.102(3) & 772.103(3), in that it was a legal entity.

    a.    Slider, Woodworth, Lawson, and Lee are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c) and *Fla. Stat.* § 772.103, who individually conducted, participated in, engaged in,

and operated and managed the affairs of Sun Communities through a pattern of racketeering activity or criminal activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c) and *Fla. Stat.* §§ 772.102(1), 772.102(4) & 772.103(3). The pattern of racketeering activity or criminal activity consisted of, but was not limited to, the acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343 and *Fla. Stat.* §§ 772.102(1)(b) (described in paragraphs 96 to 113), and extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as described in paragraphs 114 to 123).

### 7.1.3   Alternative 2: *Royal Palm Village Mobile Home Park Enterprise*

127.    In the alternative to paragraphs 125 and 126, Sun Communities, Sun OLP, Sun Home Services, RP Village, RP Village2, ALL, AIOP, and Lutz Bobo Law Firm, constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c) and *Fla. Stat.* §§ 772.102(3) & 772.103(3), in that they were "a group of individuals associated in fact" (hereinafter referred to as the "*Royal Palm Mobile Home Park Enterprise*").

    a.    Sun Communities, Sun OLP, Sun Home Services, RP Village, RP Village2, ALL, AIOP, and Lutz Bobo Law Firm shared the common purposes of defrauding Plaintiffs of money or property through the use of the fraudulent increased lot rental, including ad valorem pass-ons, and other taxes, and from premium lot rental categories.

    b.    Sun Communities, Sun OLP, Sun Home Services, RP Village, RP Village2, ALL, AIOP, and Lutz Bobo Law Firm were related in that they are all alter egos of Slider, Woodworth, Lawson, and Lee.

    c.    The *Royal Palm Mobile Home Park Enterprise* possessed sufficient longevity for the members to carry out their purpose(s) in that the

*Royal Palm Mobile Home Park Enterprise* existed from 2009 through 2019 (at a minimum).

d.     Slider, Woodworth, Lawson, and Lee are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c) and *Fla*. *Stat.* § 772.103, who individually conducted, participated in, engaged in, and operated and managed the affairs of the *Royal Palm Mobile Home Park Enterprise* through a pattern of racketeering activity or criminal activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c) and *Fla*. *Stat.* §§ 772.102(1), 772.102(4) & 772.103(3). The pattern of racketeering activity or criminal activity consisted of, but was not limited to, the acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343 and *Fla*. *Stat.* §§ 772.102(1)(b) (described in paragraphs 96 to 113), and extortion, 18 U.S.C. § 1951(a) and *Fla*. *Stat*. § 836.05 (as described in paragraphs 114 to 123).

### 7.1.4   **Alternative 3:** *Lee Enterprise*

128.    In the alternative to paragraphs 125 to 127, between 2009 and 2019 (at a minimum), Lee was an individual who constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c) and *Fla*. *Stat.* §§ 772.102(3) & 772.103(3).

a.     Slider, Woodworth, Lawson, and Lee are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c) and *Fla*. *Stat*. § 772.103, who individually conducted, participated in, engaged in, and operated and managed the affairs of Lee through a pattern of racketeering activity or criminal activity within the meaning of 18 .S.C. §§ 1961(1), 1961(5) & 1962(c) and *Fla*. *Stat*. §§ 772.102(1), 772.102(4) & 772.103(3). The pattern of racketeering activity or

criminal activity consisted of, but was not limited to, the acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343 and *Fla. Stat.* §§ 772.102(1)(b) (described in paragraphs 96 to 113), and extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as described in paragraphs 114 to 123).

### 7.1.5   Alternative 4: *Lutz Bobo Law Firm Enterprise*

129.   In the alternative to paragraphs 125 to 128, between 2009 and 2019 (at a minimum), the Lutz Bobo Law Firm constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c) and *Fla. Stat.* §§ 772.102(3) & 772.103(3), in that it was a legal entity.

a.   Slider, Woodworth, Lawson, and Lee are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c) and *Fla. Stat.* § 772.103, who individually conducted, participated in, engaged in, and operated and managed the affairs of the Lutz Bobo Law Firm through a pattern of racketeering activity or criminal activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c) and *Fla. Stat.* §§ 772.102(1), 772.102(4) & 772.103(3). The pattern of racketeering activity or criminal activity consisted of, but was not limited to, the acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343 and *Fla. Stat.* §§ 772.102(1)(b) (described in paragraphs 96 to 113), and extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as described in paragraphs 114 to 123).

### 7.1.6   Alternative 5: *DBPR Enterprise*

130.   In the alternative to paragraphs 125 to 129, between 2009 and 2019 (at a minimum), the Division of Florida Condominiums, Timeshares, and Mobile Homes of

the Florida Department of Business and Professional Regulation (*"DBPR Enterprise"*)
constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c) and
*Fla. Stat.* §§ 772.102(3) & 772.103(3), in that it was a legal entity.

      a.    Slider, Woodworth, Lawson, and Lee are each a "person," within
the meaning of 18 U.S.C. §§ 1961(3) & 1962(c) and *Fla. Stat.* §
772.103, who individually conducted, participated in, engaged
in, and operated and managed the affairs of the *DBPR Enterprise*
through a pattern of racketeering activity or criminal activity
within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c)
and *Fla. Stat.* §§ 772.102(1), 772.102(4) & 772.103(3). The pattern
of racketeering activity or criminal activity consisted of, but was
not limited to, the acts of mail and wire fraud, 18 U.S.C. §§ 1341,
1343 and *Fla. Stat.* §§ 772.102(1)(b) (described in paragraphs 96 to
113), and extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as
described in paragraphs 114 to 123).

131.    At all relevant times, the enterprises alleged in paragraphs 125 through 130
(supra) were engaged in, and their activities affected, interstate commerce and foreign
commerce.

132.    All of the acts of racketeering/crime described in paragraphs 96 to 113
and 114 to 123 were related so as to establish a pattern of racketeering activity or criminal
activity, within the meaning of 18 U.S.C. § 1962(c) and *Fla. Stat.* § 772.103(3), in that
their common purpose was to defraud Plaintiffs of money and property through the use of
the imposition or change of lot rental categories; Slider, Woodworth, Lawson, and Lee,
personally or through their agent or agents, directly or indirectly, participated in all of the
acts and employed the same or similar methods of commission; Plaintiffs were the victims
of the acts of racketeering/crime; and/or the acts of racketeering/crime were otherwise

interrelated by distinguishing characteristics and were not isolated events.

133.    All of the acts of racketeering described in paragraphs 96 to 113 and 114 to 123 were continuous so as to form a pattern of racketeering activity in that Slider, Woodworth, Lawson, and Lee engaged in the acts of racketeering/crime over a substantial period of time (i.e., from 2009 through 2019) and in that the acts of racketeering/crime have become the regular way in which Slider, Woodworth, Lawson, and Lee do business and, thus, threaten to continue indefinitely.

134.    As a direct and proximate result of, and by reason of, the activities of Slider, Woodworth, Lawson, and Lee, and their conduct in violation of 18 U.S.C. § 1962(c) and *Fla. Stat*. § 772.103(3), Plaintiffs were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c) and *Fla. Stat.* § 772.104(1). Among other things, Plaintiffs suffered damages to the extent their business or property was transferred to Slider, Woodworth, Lawson, and Lee; to the extent Plaintiffs incurred legal fees to set aside or reverse the transfers of money or property that were fraudulently made by Slider, Woodworth, Lawson, and Lee; and to the extent that Plaintiffs paid for services that provided no benefit to Plaintiffs and only inflicted harm upon them. Plaintiffs are, therefore, entitled to recover threefold the damages they sustained together with costs, reasonable attorneys' fees and reasonable experts' fees.

**7.2    Count Two – RICO; Racketeer Influenced and Corrupt Organizations Act**
Violation of 18 U.S.C. § 1962(c) – *Fla. Stat.* § 772.103(3) by Defendants Sun Communities, Sun OLP, Sun Home Services, RP Village, RP Village2, ALL, AIOP, and Lutz Bobo Law Firm

135.    Plaintiffs reallege and restate paragraphs 1 through 123.

**7.2.1    *Corporate Enterprise***

136.    Sun Communities, Sun OLP, Sun Home Services, RP Village, RP Village2, ALL, AIOP, and Lutz Bobo Law Firm constituted an "enterprise," within the meaning

of 18 U.S.C. §§ 1961(4) & 1962(c) and *Fla. Stat.* §§ 772.102(3) & 772.103(3), in that they were "a group of individuals associated in fact" (hereinafter referred to as the "*Corporate Enterprise*").

    a.    Sun Communities, Sun OLP, Sun Home Services, RP Village, RP Village2, ALL, AIOP, and Lutz Bobo Law Firm shared the common purposes of developing Royal Palm Village Mobile Home Park and defrauding Plaintiffs of money or property through the use of the fraudulent increased lot rental, including ad valorem pass-ons, and other taxes, and from premium lot rental categories;

    b.    Sun Communities, Sun OLP, Sun Home Services, RP Village, RP Village2, ALL, AIOP, and Lutz Bobo Law Firm were related in that they are all controlled by Slider, Woodworth, Lawson, and Lee, who owe to Plaintiffs a duty of good faith and fair dealing under § 723.021, *Fla. Stat.*

    c.    The *Corporate Enterprise* possessed sufficient longevity for the members to carry out their purpose(s) in that the *Corporate Enterprise* existed from 2009 through 2019 (at a minimum).

    d.    Sun Communities, Sun OLP, Sun Home Services, RP Village, RP Village2, ALL, AIOP, and Lutz Bobo Law Firm are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c) and *Fla. Stat.* § 772.103, who individually conducted, participated in, engaged in, and operated and managed the affairs of the *Corporate Enterprise* through a pattern of racketeering activity or criminal activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c) and *Fla. Stat.* §§ 772.102(1), 772.102(4) & 772.103(3). Said pattern of racketeering activity or criminal activity

Page 74

consisted of, but was not limited to, the acts of mail and wire fraud (as described in paragraphs 96 to 113), and extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as described in paragraphs 114 to 123).

### 7.2.2   Alternative 1: *Sun Communities Enterprise*

137.   In the alternative to paragraph 136, between 2009 and 2019 (at a minimum), Sun Communities constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c) and *Fla. Stat.* §§ 772.102(3) & 772.103(3), in that it was a legal entity.

  a.   Sun Communities, Sun OLP, Sun Home Services, RP Village, RP Village2, ALL, AIOP, and Lutz Bobo Law Firm, are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c) and *Fla. Stat.* § 772.103, who individually conducted, participated in, engaged in, and operated and managed the affairs of Sun Communities through a pattern of racketeering activity or criminal activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c) and *Fla. Stat.* §§ 772.102(1), 772.102(4) & 772.103(3). Said pattern of racketeering activity or criminal activity consisted of, but was not limited to, the acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343 and *Fla. Stat.* §§ 772.102(1)(b) (as described in paragraphs 96 to 113), and extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as described in paragraphs 105 to 10).

### 7.2.3   Alternative 2: *Royal Palm Village Mobile Home Park Enterprise*

138.   In the alternative to paragraphs 136 and 137**,** Sun Communities, Sun OLP, Sun Home Services, RP Village, RP Village2, ALL, AIOP, and Lutz Bobo Law Firm,

constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c) and *Fla. Stat.* §§ 772.102(3) & 772.103(3), in that they were "a group of individuals associated in "fact" (hereinafter referred to as the "*Royal Palm Mobile Home Park Enterprise*").

    a.    Sun Communities, Sun OLP, Sun Home Services, RP Village, RP Village2, ALL, AIOP, and Lutz Bobo Law Firm, shared the common purposes of defrauding Plaintiffs of money or property through the imposition or change in lot rental categories.

    b.    Sun Communities, Sun OLP, Sun Home Services, RP Village, RP Village2, ALL, AIOP, and Lutz Bobo Law Firm, were related in that they are all alter egos of Slider, Woodworth, Lawson, and Lee.

    c.    The *Royal Palm Mobile Home Park Enterprise* possessed sufficient longevity for the members to carry out their purpose(s) in that the *Royal Palm Mobile Home Park Enterprise* existed from 2009 through 2019 (at a minimum).

    d.    Sun Communities, Sun OLP, Sun Home Services, RP Village, RP Village2, ALL, AIOP, and Lutz Bobo Law Firm, are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c) and *Fla. Stat.* § 772.103, who individually conducted, participated in, engaged in, and operated and managed the affairs of the *Royal Palm Mobile Home Park Enterprise* through a pattern of racketeering activity or criminal activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c) and *Fla. Stat.* §§ 772.102(1), 772.102(4) & 772.103(3). Said pattern of racketeering activity or criminal activity consisted of, but was not limited to, the acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343 and *Fla. Stat.* §§ 772.102(1)(b) (as described in paragraphs 96 to 113), and extortion, 18 U.S.C. §

1951(a) and *Fla. Stat.* § 836.05 (as described in paragraphs 114 to
123).

**7.2.4   Alternative 3: *Lee Enterprise***

139.    In the alternative to paragraphs 136 to 138, between 2009 and 2019, Lee
was an individual who constituted an "enterprise," within the meaning of 18 U.S.C. §§
1961(4) & 1962(c) and *Fla. Stat.* §§ 772.102(3) & 772.103(3).

       a.      Sun Communities, Sun OLP, Sun Home Services, RP Village,
RP Village2, ALL, AIOP, and Lutz Bobo Law Firm, are each a
"person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c)
and *Fla. Stat.* § 772.103, who individually conducted, participated
in, engaged in, and operated and managed the affairs of Lee
through a pattern of activity or criminal activity within the meaning
of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c) and *Fla. Stat.* §§
772.102(1), 772.102(4) & 772.103(3). Said pattern of racketeering
activity or criminal activity consisted of, but was not limited to,
the acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343 and *Fla.
Stat.* §§ 772.102(1)(b)(as described in paragraphs 96 to 113), and
extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as described
in paragraphs 114 to 123).

**7.2.5   Alternative 4: *Lutz Bobo Law Firm Enterprise***

140.    In the alternative to paragraphs 136 to 139 between 2009 and 2019 (at a
minimum), the Lutz Bobo Law Firm constituted an "enterprise," within the meaning of
18 U.S.C. §§ 1961(4) & 1962(c) and *Fla. Stat.* §§ 772.102(3) & 772.103(3), in that it was a
legal entity.

       a.      Sun Communities, Sun OLP, Sun Home Services, RP Village,

RP Village2, ALL, AIOP, and Lutz Bobo Law Firm, are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c) and *Fla. Stat.* § 772.103, who individually conducted, participated in, engaged in, and operated and managed the affairs of the Lutz Bobo Law Firm through a pattern of racketeering activity or criminal activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c) and *Fla. Stat.* §§ 772.102(1), 772.102(4) & 772.103(3). Said pattern of racketeering activity or criminal activity consisted of, but was not limited to, the acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343 and *Fla. Stat.* §§ 772.102(1)(b) (as described in paragraphs 96 to 113, and extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as described in paragraphs 114 to 123).

### 7.2.6   Alternative 5: *DBPR Enterprise*

141.    In the alternative to paragraphs 136 to 140 between 2009 and 2019 (at a minimum), the Division of Florida Condominiums, Timeshares, and Mobile Homes of the Florida Department of Business and Professional Regulation (*"DBPR Enterprise"*) constituted an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c) and *Fla. Stat.* §§ 772.102(3) & 772.103(3), in that it was a legal entity.

a.    Sun Communities, Sun OLP, Sun Home Services, and Lutz Bobo Law Firm, each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c) and *Fla. Stat.* § 772.103, who individually conducted, participated in, engaged in, and operated and managed the affairs of the *DBPR Enterprise* through a pattern of racketeering activity or criminal activity within the meaning of 18 U.S.C. §§

1961(1), 1961(5) & 1962(c) and *Fla. Stat.* §§ 772.102(1), 772.102(4) & 772.103(3). Said pattern of racketeering activity or criminal activity consisted of, but was not limited to, the acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343 and *Fla. Stat.* §§ 772.102(1)(b) (as described in paragraphs 96 to 113), and extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as described in paragraphs 114 to 123).

142.    At all relevant times, the enterprises alleged in paragraphs 136 through 141 (supra) were engaged in, and their activities affected, interstate commerce and foreign commerce.

143.    All of the acts of racketeering described in paragraphs 96 to 113 and 114 to 123 were related so as to establish a pattern of racketeering activity or criminal activity, within the meaning of 18 U.S.C. § 1962(c) and *Fla. Stat.* § 772.103(3), in that their common purpose was to defraud Plaintiffs of money and property through the imposition or change of lot rental categories, their common result was to defraud Plaintiffs of money and property through the use of fraudulent invoices for payment of increased lot rental and payment of excessive ad valorem tax pass-ons from the sale and purchase of the Park; Sun Communities, Sun OLP, Sun Home Services, RP Village, RP Village2, ALL, AIOP, and Lutz Bobo Law Firm, personally or through their agent or agents, directly or indirectly, participated in all of the acts and employed the same or similar methods of commission; Plaintiffs were the victims of the acts of racketeering; and/or the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

144.    All of the acts of racketeering described in paragraphs 96 to 113 and 114 to 123 were continuous so as to form a pattern of racketeering activity in that Sun Communities, Sun OLP, Sun Home Services, RP Village, RP Village2, ALL, AIOP, and

Lutz Bobo Law Firm engaged in the acts of racketeering/crime over a substantial period of time (i.e., from 2009 through 2019) and in that the acts of racketeering/crime have become the regular way in which Sun Communities, Sun OLP, Sun Home Services, RP Village, RP Village2, ALL, AIOP, and Lutz Bobo Law Firm do business and, thus, threaten to continue indefinitely.

145.    As a direct and proximate result of, and by reason of, the activities of Sun Communities, Sun OLP, Sun Home Services, RP Village, RP Village2, ALL, AIOP, and Lutz Bobo Law Firm and their conduct in violation of 18 U.S.C. § 1962(c) and *Fla. Stat.* § 772.103(3), Plaintiffs were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c) and *Fla. Stat.* § 772.104(1). Among other things, Plaintiffs suffered damages to the extent their business or property was transferred to Sun Communities, Sun OLP, Sun Home Services, RP Village, RP Village2, ALL, AIOP, and Lutz Bobo Law Firm; to the extent Plaintiffs incurred legal fees to set aside or reverse the transfers of money or property that were fraudulently made by Sun Communities, Sun OLP, Sun Home Services, RP Village, RP Village2, ALL, AIOP, and Lutz Bobo Law Firm; and to the extent that Plaintiffs paid for services that provided no benefit to Plaintiffs and only inflicted harm upon them. Plaintiffs are, therefore, entitled to recover threefold the damages they sustained together with costs, reasonable attorneys' fees, and reasonable experts' fees.

**7.3**     **Count Three – RICO; Racketeer Influenced and Corrupt Organizations Act**
Violation of 18 U.S.C. § 1962(d) – *Fla. Stat.* § 772.103(4) by Defendants Slider, Woodworth, Lawson, and Lee

146.     Plaintiffs reallege and restate paragraphs 1 through 123.

147.     As alleged in Count One, one or more of the following individuals violated 18 U.S.C. § 1962(c) and *Fla. Stat.* § 772.103(3): Slider, Woodworth, Lawson, and Lee. Any of these person(s) who violated 18 U.S.C. § 1962(c) and *Fla. Stat.* § 772.103(3) are referred to as the "Violator(s)" for the remainder of this Count.

148.     Slider, Woodworth, Lawson, and/or Lee, conspired with the Violator(s) to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises (*supra*, ¶¶ 125-130) through a pattern of racketeering activity or criminal activity (*see* 96 to 113 and 114 to 123) in violation of 18 U.S.C. § 1962(d) and *Fla. Stat.* § 772.103(4). In particular, Slider, Woodworth, Lawson, and Lee intended to further an endeavor of the Violator(s) which, if completed, would satisfy all of the elements of a substantive RICO criminal offense (18 U.S.C. § 1962(c) and *Fla. Stat.* § 772.103(3)) and adopted the goal of furthering or facilitating the criminal endeavor.

149.     Plaintiffs were injured by Slider, Woodworth, Lawson, and Lee's overt acts that are acts of racketeering/crime or otherwise unlawful under the RICO statute, which included (among other acts) mail and wire fraud, 18 U.S.C. §§ 1341, 1343 and *Fla. Stat.* §§ 772.102(1)(b) (as described in paragraphs 96 to 113), and extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as described in paragraphs 114 to 123).

150.     As a direct and proximate result of, and by reason of, the activities of Slider, Woodworth, Lawson, and/or Lee, and their conduct in violation of 18 U.S.C. § 1962(d) and *Fla. Stat.* § 772.103(4), Plaintiffs were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c) and *Fla. Stat.* § 772.104(1).

Among other things, Plaintiffs suffered damages to the extent their business or property was transferred to Slider, Woodworth, Lawson, and/or Lee; to the extent Plaintiffs incurred legal fees to set aside or reverse the transfers of money or property that were fraudulently made by Slider, Woodworth, Lawson, and/or Lee; and to the extent that Plaintiffs paid for services that provided no benefit to Plaintiffs and only inflicted harm upon them. Plaintiffs are, therefore, entitled to recover threefold the damages they sustained together with costs, reasonable attorneys' fees, and reasonable experts' fees.

**7.4    Count Four – RICO Conspiracy; Racketeer Influenced and Corrupt Organizations Act**
Violation of 18 U.S.C. § 1962(d) – *Fla. Stat.* § 772.103(4) by Defendants Sun Communities, Sun OLP, Sun Home Services, RP Village, RP Village2, ALL, AIOP, and Lutz Bobo Law Firm

151.    Plaintiffs reallege and restate paragraphs 1 through 123.

152.    As alleged in Count One, the following individuals violated 18 U.S.C. § 1962(c) and *Fla. Stat.* § 772.103(3): Slider, Woodworth, Lawson, and Lee.

**7.4.1    Sun Communities, Sun OLP, Sun Home Services, RP Village, RP Village2, ALL, AIOP, and/or Lutz Bobo Law Firm conspired with Slider, Woodworth, Lawson, and/or Lee**

153.    Sun Communities, Sun OLP, Sun Home Services, RP Village, RP Village2, ALL, AIOP,  and/or Lutz Bobo Law Firm conspired with Slider, Woodworth, Lawson, and/or Lee to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises (*see supra*, ¶¶ 125-130) through a pattern of racketeering activity or criminal activity (*see supra*, ¶¶ 96 to 113 and 114 to 123) in violation of 18 U.S.C. § 1962(d) and *Fla. Stat.* § 772.103(4). In particular, Sun Communities, Sun OLP, Sun Home Services, RP Village, RP Village2, ALL, AIOP, and/or Lutz Bobo Law Firm intended to further an endeavor of Slider, Woodworth, Lawson, and/or Lee which, if completed, would satisfy all of the elements of a substantive RICO criminal offense

(18 U.S.C. § 1962(c) and *Fla. Stat.* § 772.103(3)) and adopted the goal of furthering or facilitating the criminal endeavor.

### 7.4.2   AIOP, Sun OLP, and/or Sun Home Services conspired with Lee and/or Slider

154.   AIOP, Sun OLP, and/or Sun Home Services conspired with Lee and/or Slider to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises (*see supra*, ¶¶ 125-130) through a pattern of racketeering activity or criminal activity (*see supra*, ¶¶ 96 to 113 and 114 to 123) in violation of 18 U.S.C. § 1962(d) and *Fla. Stat.* § 772.103(4). In particular, AIOP, Sun OLP, and/or Sun Home Services intended to further an endeavor of Lee and/or Slider which, if completed, would satisfy all of the elements of a substantive RICO criminal offense (18 U.S.C. § 1962(c) and *Fla. Stat.* § 772.103(3)) and adopted the goal of furthering or facilitating the criminal endeavor.

### 7.4.3   RP Village and RP Village2 conspired with Slider, Woodworth, Lawson, and/or Lee

155.   RP Village and RP Village2 conspired with Slider, Woodworth, Lawson, and/or Lee to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises (*see supra*, ¶¶ 125-130) through a pattern of racketeering activity or criminal activity (*see supra*, ¶¶ 96 to 113 and 114 to 123) in violation of 18 U.S.C. § 1962(d) and *Fla. Stat.* § 772.103(4). In particular, RP Village and RP Village2 intended to further an endeavor of Slider, Woodworth, Lawson, and/or Lee which, if completed, would satisfy all of the elements of a substantive RICO criminal offense (18 U.S.C. § 1962(c) and *Fla. Stat.* § 772.103(3)) and adopted the goal of furthering or facilitating the criminal endeavor.

### 7.4.4   RP Village, RP Village2, and ALL conspired with Lee

156.    RP Village, RP Village2, and ALL conspired with Lee to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises (*see supra*, ¶¶ 125-130) through a pattern of racketeering activity or criminal activity (*see supra*, ¶¶ 96 to 113 and 114 to 123) in violation of 18 U.S.C. § 1962(d) and *Fla. Stat.* § 772.103(4). In particular, RP Village, RP Village2, and ALL intended to further an endeavor of Lee which, if completed, would satisfy all of the elements of a substantive RICO criminal offense (18 U.S.C. § 1962(c) and *Fla. Stat.* § 772.103(3)) and adopted the goal of furthering or facilitating the criminal endeavor.

157.    Plaintiffs were injured by Sun Communities, Sun OLP, Sun Home Services, RP Village, RP Village2, ALL, AIOP, and Lutz Bobo Law Firm's overt acts that are acts of racketeering/crime or otherwise unlawful under the RICO statute, which included (among other acts) acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343 and *Fla. Stat.* §§ 772.102(1)(b) (as described in paragraphs 96 to 113 , *supra*), and extortion, 18 U.S.C. § 1951(a) and *Fla. Stat.* § 836.05 (as described in paragraphs 114 to 123, *supra*).

158.    As a direct and proximate result of, and by reason of, the activities of Sun Communities, Sun OLP, Sun Home Services, P Village, RP Village2, ALL, AIOP, and Lutz Bobo Law Firm and their conduct in violation of 18 U.S.C. § 1962(d) and *Fla. Stat.* § 772.103(4), Plaintiffs were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c) and *Fla. Stat.* § 772.103(3). Among other things, Plaintiffs suffered damages to the extent their business or property was transferred to Slider, Woodworth, Lawson, and/or Lee; to the extent Plaintiffs incurred legal fees to set aside or reverse the transfers of money or property that were fraudulently made by Slider, Woodworth, Lawson, and/or Lee; and to the extent that Plaintiffs paid for

services that provided no benefit to Plaintiffs and only inflicted harm upon them. Plaintiffs are, therefore, entitled to recover threefold the damages they sustained together with costs, reasonable attorneys' fees, and reasonable experts' fees.

**7.5     Count Five – Unjust Enrichment**
        by Defendants Slider, Woodworth, Lawson, and Lee

159.     Plaintiffs reallege and restate paragraphs 1 through 123.

160.     Slider, Woodworth, Lawson, and Lee each individually, received a benefit or and enrichment from Plaintiffs.

161.     The benefit retained by Slider, Woodworth, Lawson, and Lee has been at the expense or impoverishment of Plaintiffs.

162.     There is a relationship between the enrichment of Slider, Woodworth, Lawson, and Lee and the impoverishment of Plaintiffs.

163.     It would be unjust for Slider, Woodworth, Lawson, and Lee to retain the benefit that they received from Plaintiffs.

164.     Slider, Woodworth, Lawson, and Lee's unjust enrichment is not justified.

165.     Plaintiffs were directly injured by reason of the unjust enrichment of Slider, Woodworth, Lawson, and Lee. Plaintiffs do not have an adequate remedy at law.

166.     As a direct and proximate result of, and by reason of, the Defendants unjust enrichment, the Plaintiffs were injured and suffered damages in excess of $1,000,000 to the extent their monies were illegally transferred to the Defendants via payment of the higher lot rent and ad valorem pass-ons through the illegal and fraudulent increased lot rental, including ad valorem pass-ons, and other taxes, and from premium lot rental categories; to the extent Plaintiffs incurred legal fees to set aside or reverse the transfers of money or property that were fraudulently made by

the Defendants; to the extent that Plaintiffs paid for services that provided no benefit to Plaintiffs and only inflicted harm upon them; and to the extent that Plaintiffs have suffered $10,000 to $15,000 reduction in their resale value and expect to suffer a total of over $1,000,0000 over the expected 14 years of a typical mobile home park turnover. Plaintiffs are, therefore, entitled to recover the damages they sustained together with costs, reasonable attorneys' fees, and reasonable experts' fees.

**7.6    Count Six – Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")**
Violation of §§ 501.204, and 501.211, *Fla. Stat.* by all Defendants

167.    Plaintiffs reallege and restate paragraphs 1 through 123.

168.    The Defendants have violated §§ 501.204 and 501.211, *Fla. Stat.*, which prohibit as unlawful unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of trade or commerce.

169.    The Florida Legislature expressly stated that §§ 501.201, *Fla. Stat., et. seq.*, is remedial. Section 501.202, *Fla. Stat.*, reads: "The provisions of this part shall be construed liberally to promote the following policies:

*** 

(1)    To simplify, clarify, and modernize the law governing consumer protection, unfair methods of competition, and unconscionable, deceptive, and unfair trade practices.

(2)    To protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

(3)    To make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection."

Page 86

\*\*\*

170.    In 1993 the Florida Legislature amended the definition of "Trade or commerce" in § 501.203(8), *Fla. Stat.,* to include services ("... any good or service..."), thereby overruling *Florida v. De Anza Corp.*, 416 So.2d 1173 (Fla. 5th DCA), *pet. den.*, 424 So.2d 763 (Fla. 1982). *De Anza* was also disapproved by the Florida Supreme Court in *Lanca Homeowners, Inc. v. Lantana Cascade of Palm Beach, Ltd.*, 541 So.2d 1121 (Fla. 1988), *cert den.*, 493 U.S. 964 (1989).

171.    The 1993 amendment of § 501.203(8), *Fla. Stat.,* also expansively defined "Trade or commerce" to mean "... the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of *any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated*. 'Trade or commerce' shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity.

(Emphasis added)

172.    As mobile home owners and renters of the lot beneath their homes, the Plaintiffs are consumers.

173.    Section 501.203(3), *Fla. Stat.,* defined a "Violation of this part" to mean "... any violation of this act and may be based upon any of the following: ...

\*\*\*

(b)    The standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts;

(c)    Any law, statute, rule, regulation, or ordinance which proscribes

Page 87

unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices."

\*\*\*

174.    Sun Communities has continued to send Plaintiffs monthly bills, invoices and demands for payment of illegal higher lot rent and ad valorem pass-ons through the imposition or change in lot rental categories.

175    Defendants continue to assert, enforce, and threaten their improper authority to assess and lien to coerce payment of illegal higher lot rent and ad valorem pass-ons through the imposition or change in lot rental categories pursuant to the provisions of the lot rental agreement in violation of §§ 723.021, 501.204, and 501.211, *Fla. Stat.*

176.    Defendants conspire, participate, joined together or act in concert to violate §§ 501.204, 501.211, 723.021, and 723.059, *Fla. Stat.*, to benefit themselves, each other, and Slider, Woodworth, Lawson, Sun Communities, Sun OLP, Sun Home Services, RP Village, RP Village2, ALL, and AIOP**.**

177.    Defendants, their agents, officers, and directors each participated and were aware of the repeated and continuing violations of §§ 501.204, 501.211, 723.021, and 723.059, *Fla. Stat.*

178.    Defendants' acts caused or were likely to cause unjustified injury to the Plaintiffs - namely, injury that is substantial, not outweighed by countervailing benefits to the Plaintiffs or competition that the act or practice produces, and an injury that the Plaintiffs could not reasonably have avoided.

179.    Defendants' acts offend public policy and are immoral, unethical, oppressive, unscrupulous or substantially injurious to the Plaintiffs.

180.    As a direct and proximate result of, and by reason of, the activities of the

Defendants in violation of *Fla. Stat.* §§ 501.204, and 501.211, Plaintiffs were injured and suffered actual damages in excess of $1,000,000 to the extent their monies were illegally transferred to the Defendants via payment of the higher lot rent and ad valorem pass-ons through the illegal and fraudulent through the imposition or change in lot rental categories; to the extent Plaintiffs incurred legal fees to set aside or reverse the transfers of money or property that were fraudulently made by the Defendants; to the extent that Plaintiffs paid for services that provided no benefit to Plaintiffs and only inflicted harm upon them; and to the extent that Plaintiffs have suffered $10,000 to $15,000 reduction in their resale value and expect to suffer a total of over $1,000,000 over the expected 14 years of a typical mobile home park turnover. Plaintiffs are, therefore, entitled to recover the damages they sustained together with costs, reasonable attorneys' fees, and reasonable experts' fees.

181.   Plaintiffs have been aggrieved by the Defendants' violation of *Fla. Stat.* §§ 501.204, 501.211, 723.021, and 723.059, *Fla. Stat.*

182.   Plaintiffs also seek declaratory judgment under § 501.211(1), *Fla. Stat.* Section 501.211(1), *Fla. Stat.*, reads that: "... anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part."

183.   As a result, the Plaintiffs are in doubt as to their legal rights under the law. There exists a present, actual need for declaratory relief concerning these bona fide disputes.

7.7    **Count Seven – Denial of Rights of Access under Americans with Disabilities Act ("ADA") –** Violations of the Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12101 *et seq.*) and related Florida statutes by Defendants Slider, Woodworth, Lawson, Sun Communities, Sun OLP, Sun Home Services, RP Village, RP Village2, ALL, and AIOP

184.    Plaintiffs reallege and restate paragraphs 1 through 94.

185.    The Plaintiffs are "elderly persons" as defined by Section 825.101( 4), *Fla. Stat.*, as persons " ... 60 years of age or older who is suffering from the infirmities of aging as manifested by advanced age or organic brain damage, or other physical, mental, or emotional dysfunctioning, to the extent that the ability of the person to provide adequately for the person's own care or protection is impaired." The Plaintiffs have mobility, balance, gait, vision, and hearing difficulties. When traveling about in public, many Plaintiffs require the use of either walking canes or sticks, walkers, wheelchairs, audiovisual devices, and hearing aids. Consequently, many Plaintiffs are "physically disabled," as defined by all applicable Florida and United States laws, and a member of the public whose rights are protected by these laws.

186.    Plaintiffs suffer from low vision and age-related cognitive decline as a "qualified disability" under the ADA as defined in 42 U.S.C. §12012 (1)(A) and in 42 U.S.C. 3602, §802(h). They are substantially limited in performing one or more major life activities, including but not limited to accurately visualizing their world, adequately traversing obstacles and walking without assistance.

187.    The Park and its facilities is a public accommodation, open to the public, which is intended for nonresidential use and whose operation affects commerce.

188.    The Plaintiffs live in the Royal Palm Village Mobile Home Park and visit the Park facilities on a regular basis. Plaintiffs regularly encounter barriers (both physical and intangible) that interfered with - if not outright denied - their ability to

use and enjoy the goods, services, privileges and accommodations offered at the Park. Plaintiffs personally encountered the following barriers at the Facility:

a)     The only ramp located at the Clubhouse parking area is improperly configured and contains no guide curbs. Designated Wheelchair Parking Spaces at the Pool and gym must be re-drawn and re-painted in accordance with ADA regulations to allow for a proper wheelchair loading and unloading;

b)     On numerous occasions during their visits to the Clubhouse, Plaintiffs experienced problems when transferring onto their wheelchair from their vehicle because of the configuration and side-slope of the designated parking space and access aisle located next to it;

c)     During many visits to the Park operations center located just inside the entrance to the Park, Plaintiffs have attempted but been unable to enter the operations center because the door of the office is too narrow for a wheelchair;

d)     Plaintiffs have been unable to enter the Park operations center by using an alternative entrance. Plaintiffs have been unable to place their rental payment into the box located outside of the operations center and have had to return to place their payment in the box;

e)     The entrances to the Park Clubhouse and operations center have no wheelchair-friendly automated electric doors and entry/exit pads. The Clubhouse should be equipped with additional automated electric doors and entry/exit pads in the event of an

emergency evacuation;

f)      The Clubhouse stage lacks a wheelchair ramp to the stage for the disabled to participate in numerous Community activities;

g)      The bathroom stalls were re-configured for handicap accessibility during the Park Clubhouse remodeling phase approximately two years ago; however, the actual doors to enter or exit the women's washroom is impossible for a wheelchair bound individual to open from the inside without assistance. An automated electric door would eliminate this problem for both men's and women's washrooms. The restrooms also lack necessary wheelchair clearances to use the sink. Plaintiffs experienced difficulty on many occasions while trying to use the restroom in the four years preceding this action;

h)      None of the Park pools or hot tub have a lift. The pool decks are not wheelchair accessible. The gates for the pool decks will not allow wheelchair users the ability to enter or exit the pool decks without assistance;

i)      The entrance to the gym is not equipped with automated electric doors to allow wheelchair entry or exit without assistance;

189.    Plaintiffs were, and continue to be deterred from visiting the Clubhouse because they know that the Clubhouse's goods, services, facilities, privileges, advantages, and accommodations deny full and equal access to Plaintiffs due to their physical disabilities. Plaintiffs have learned that the following additional barriers to their full and equal access exist at the facility, each of which relates to his disabilities:

### 7.7.1   Site Entrance Signage

a)    Site informational signage was not provided directing to the accessible entrance and route of travel.

b)    Tow-away warning signage was not provided visible from the street entrance or accessible parking space.

### 7.7.2   Accessible Parking

c)    Van accessible signage was not provided for the van accessible parking space.

d)    Accessible parking access aisles was not outlined in blue.

e)    Accessible parking signage mounted on the pole is not 80" minimum above the surface.

### 7.7.3   Exterior Accessible Routes

f)    A minimum of one accessible route was not provided from the public way to the accessible entrance.

g)    Sidewalk has raised lips that exceed 1/4" in height.

h)    Ramp at the end of the access aisle does not have edge protection on both sides of the ramp and exceeds 8.33%.

### 7.7.4   Accessible Doors

i)    Entrance door thresholds exceed 1/2″ in height.

j)    Entrance door landings exceed 2% slope.

k)    Entrance doors do not have the required smooth kick plate 10" high on the bottom of the doors.

### 7.7.5   Restrooms

l)    Side grab bars are not 48" long and extending a minimum of 24"

in front of the toilet.

m)   Rear grab bar was not properly located on the wide side of the toilet.

n)   Soap dispenser was not located to be 40" maximum above floor to operable parts.

o)   Toilet paper dispenser was not located to be 7"- 9" in front of toilet.

p)   Plumbing and sharp objects under sink were not properly protected.

q)   Toilet was not offset to be 16"-18" from side wall.

r)   Proper floor clear area was not provided in front of the toilet for transfer space.

### 7.7.6   General

s)   Defendants do not have policies, practice and procedures in place to ensure that the Park is maintained in a condition so as to provide full and equal access to persons in wheelchairs.

t)   There are no fire alarms, strobes, horns or sprinkler system in the main social events or large congregational hall.

190.   Plaintiffs live at the Royal Palm Village Mobile Home Park and must have ongoing access to the Clubhouse.

191.   Defendants knew or should have known that these elements and areas of the Clubhouse were inaccessible, violate state and federal law, and interfere with or deny access to the physically disabled. Moreover, Defendants have the financial resources to remove these barriers from the Park without much difficulty or expense, and make the Park accessible to the physically disabled. To date, however, Defendants

refuse to either remove those barriers or seek an unreasonable hardship exemption to excuse noncompliance.

192.    At all relevant times, Defendants have possessed and enjoyed sufficient control and authority to modify the Park to remove impediments to wheelchair access and to comply with the 2010 Standards for Accessible Design. Defendants have not removed such impediments and have not modified the Park to conform to accessibility standards. Defendants have intentionally maintained the Park in its current condition and have intentionally refrained from altering the Park so that it complies with the accessibility standards.

193.    Title III of the ADA holds as a "general rule" that no individual shall be discriminated against on the basis of disability in the full and equal enjoyment (or use) of goods, services, facilities, privileges, and accommodations offered by any person who owns, operates, or leases a place of public accommodation. 42 U.S.C. § 12182(a).

194.    Defendants discriminated against Plaintiffs by denying them "full and equal enjoyment" and use of the goods, services, facilities, privileges and accommodations of the Clubhouse during each visit and each incident of deterrence.

### 7.7.7   Failure to Remove Architectural Barriers in an Existing Facility

195.    The ADA specifically prohibits failing to remove architectural barriers, which are structural in nature, in existing facilities where such removal is readily achievable. 42 U.S.C. § 12182(b)(2)(A)(iv).

196.    When an entity can demonstrate that removal of a barrier is not readily achievable, a failure to make goods, services, facilities, or accommodations available through alternative methods is also specifically prohibited if these methods are readily achievable. *Id.* 42 U.S.C. § 12182(b)(2)(A)(v).

197.    Here, Plaintiffs allege that Defendants can easily remove the

architectural barriers at the Park without much difficulty or expense, and that Defendants violated the ADA by failing to remove those barriers, when it was readily achievable to do so.

198.    In the alternative, if it was not "readily achievable" for Defendants to remove the Park's barriers, then Defendants violated the ADA by failing to make the required services available through alternative methods, which are readily achievable.

### 7.7.8    Failure to Make an Altered Facility Accessible

199.    On information and belief, Defendants have made substantial alterations to the Clubhouse since 2015 and have failed to make the altered Clubhouse accessible.

### 7.7.9    Failure to Modify Existing Policies and Procedures

200.    Defendants have failed to modify their existing policies and procedures to address accessibility and ADA compliance.

201.    Plaintiffs have been obligated to retain the undersigned counsel for the filing and prosecution of this action. Plaintiffs are entitled to have reasonable attorneys' fees, costs and expenses paid by Defendants.

WHEREFORE, Plaintiffs demand judgment against Defendants and request injunctive and declaratory relief.

**7.8      Count Eight – Florida Mobile Home Act - Breach of statutory duties and lot rental agreement**
Violation of Sections 723.022, 723.017, 723.021, 723.037, 723.068, 723.033(1)(f), 723.025, and 723.061(1)(c), *Fla. Stat.,* by all Defendants

202.      Plaintiffs reallege and restate paragraphs 1 through 123.

**7.8.1   Defendants failed to comply with requirements of applicable building, housing, and health codes**

203.      Section 723.022(1), *Fla. Stat.*, mandates that a "... mobile home park owner shall at all times ... [c]omply with the requirements of applicable building, housing, and health codes."

204.      Defendants have a continuing duty to comply with building, housing and health codes under § 723.022(1), *Fla. Stat.* Section 723.022(1) creates a statutory warranty of habitability. *Grant v. Thornton*, 749 So.2d 529 (Fla. 2nd DCA 1999) (in *dicta*, the *Grant* court noted that § 83.51, *Fla. Stat.*, requirement that a landlord comply with "... applicable building, housing, and health codes ..." had been said to "... create a statutory warranty of habitability."); *see also, Lifter, Inc. v. Varnado*, 480 So. 2d 1336 (Fla. 3d DCA 1985), *rev. dismissed*, 484 So. 2d 7 (Fla. 1986); *Mansur v. Eubanks*, 401 So. 2d 1328 (Fla. 1981); *See also Renken v. Ludwig*, 2002 Wash. App. LEXIS 322 (February 21, 2002). *See also Thomas v. Goudreault,* 163 Ariz. 159, 786 P.2d 1010 (Ariz. Ct. App. 1989).

205.      The Defendants have unreasonably failed to comply with the requirements of the applicable building, housing, and health codes by permitting extensive stormwater flooding of the lots and common areas in the Park.

206.      Section 723.022 imposes a continuing duty upon Defendants to provide a lot stable enough to support a mobile home.

207.      Under § 15C-1.0102(3), *Florida Administrative Code*, Defendants have a continuing duty to grade the area beneath and around the Plaintiffs' mobile home

and slope the grading so that water will not accumulate under the home. The pier foundation must be placed on "... stable soil or compacted fill."

208.     The *Florida Administrative Code* also requires landlords to ensure that sites rented for the purpose of installing mobile homes are strong enough to bear the load. Section 15C-1.0102(3) required all park owners to ensure compaction and load-bearing ability sufficient to meet the support requirements of the *Florida Building code*.

209.     Under § 64E-15.002(1)(a), *Florida Administrative Code*, Defendants have a continuing duty to grade the park spaces so that water drainage will not cause standing water under the unit.

210.     Under § 40C-42.026, *Florida Administrative Code*, Defendants have a continuing duty to manage the storm water drainage system so that storm water drainage will not cause standing water for greater than 72 hours. [Repealed 10/1/2013]

211.     The Park continues to experience periodic flooding as a result of improper drainage. Excessive water collects in the common areas, on the mobile home lot, and under, around, and between the Homeowners' homes. Improper grading and fill prevents proper drainage of the storm water from under or around the Homeowners' homes. The Defendants have allowed storm water to pool between homes. The Defendants have allowed ankle deep storm water to pool in the driveways and walkways leading to mobile homes.

212.     The Homeowners' homes and personal belongings are damaged by excessive moisture and mold or mildew growth. Air conditioner compressors and ductwork are damaged by excessive water pooling under, between and around homes. The concrete slab base for the air conditioners sink and cease to be level. Exterior air conditioner ducts are installed improperly along the ground allows moisture to enter the duct and accumulate as mold or mildew.

213.    The Plaintiffs and Homeowners have reported to the Defendants numerous instances of:

(a)    pooling of water under, around, and between the mobile homes;

(b)    water and mold or mildew damage to the mobile homes and personal property;

(c)    pooling of water in driveways and walkways leading to mobile homes;

(d)    pooling has caused structural damage to tie-downs and anchoring systems of homes. The structural integrity of many homes has been severely compromised. Numerous homes have settling which causes damage to the home, ill-fitting doors, cabinets, windows, and frames and a severe reduction in resale value;

214.    The Defendants have breached their duty to the Homeowners by refusing to correct these flooding and drainage problems.

215.    The Defendants have breached their duty to permit the Homeowners to peacefully and quietly enjoy the possession of the premises.

216.    The Defendants breached their statutory warranty of habitability and duty by failing to properly construct and maintain the Park's storm water management system located in violation of building, housing and health codes. The defective and dangerous conditions of the premises constituted a nuisance within the meaning of § 823.01, *Fla. Stat.*, in that they deprived Homeowners of the safe, healthy, and comfortable use of the premises and disturbed the Homeowners' peaceful and quiet enjoyment of their lot and the Park.

**7.8.2    Defendants failed to maintain utility connections and systems for which the Park Owner is responsible in proper operating condition**

217.    The Defendants failed to maintain utility connections and systems for which the Park Owner is responsible in proper operating condition.

218.    Section 723.022(4), *Fla*. *Stat*., mandates that a "... mobile home park owner shall at all times ... [m]aintain utility connections and systems for which the park owner is responsible in proper operating condition."

219.    Defendants have a continuing duty to maintain the sewer and stormwater drainage system in the Park and its attendant utility connections and systems in proper operating condition under § 723.022(4), *Fla*. *Stat*.

220.    The Defendants have unreasonably failed to maintain the sewer and stormwater drainage system in the Park and its attendant utility connections and systems in proper operating condition as evidenced by the extensive and repeated flooding of the lots and the Park common areas.

### 7.8.3    Defendants failed to maintain the common areas in a good state of appearance, safety, and cleanliness

221.    The Defendants failed to maintain the common areas in a good state of appearance, safety, and cleanliness.

222.    Section 723.022(2), *Fla*. *Stat*., mandates that a "... mobile home park owner shall at all times ... [m]aintain the common areas in a good state of appearance, safety, and cleanliness."

223.    Defendants have a continuing duty to maintain the common areas in a good state of appearance, safety, and cleanliness under § 723.022(2), *Fla*. *Stat*.

224.    The Defendants have unreasonably failed to maintain the common areas in a good state of appearance, safety, and cleanliness as evidenced by the unreasonable elimination or reduction of services and facilities, including, but not limited to, the extensive and repeated flooding of the lots and the Park common areas.

### 7.8.4    Defendants failed to maintain buildings and improvements in common areas in a good state of repair and maintenance

225.    The Defendants failed to maintain buildings and improvements in

common areas in a good state of repair and maintenance.

226.    Section 723.022(2), *Fla. Stat.*, mandates that a "... mobile home park owner shall at all times ... [m]aintain buildings and improvements in common areas in a good state of repair and maintenance...."

227.    Defendants have a continuing duty to maintain the  buildings and improvements in common areas in a good state of repair and maintenance under § 723.022(2), *Fla. Stat.*

228.    The Defendants have unreasonably failed to maintain the buildings and improvements in common areas in a good state of repair and maintenance as evidenced by the unreasonable elimination or reduction of services and facilities, including, but not limited to, the extensive and repeated flooding of the lots and the Park common areas.

**7.8.5    Defendants failed to provide access to the common areas at all reasonable times for the benefit of the Park residents and their guests**

229.    The Defendants failed to provide access to the common areas at all reasonable times for the benefit of the Park residents and their guests.

230.    Section 723.022(3), *Fla. Stat.*, mandates that a "... mobile home park owner shall at all times ... [p]rovide access to the common areas, including buildings and improvements thereto, at all reasonable times for the benefit of the park residents and their guests."

231.    Defendants have a continuing duty to provide access to the common areas, including buildings and improvements thereto, at all reasonable times for the benefit of the park residents and their guests under § 723.022(3), *Fla. Stat.*

232.    The Defendants have unreasonably failed to provide access to the common areas, including buildings and improvements thereto, at all reasonable times

for the benefit of the park residents and their guests as evidenced by the unreasonable elimination or reduction of services and facilities, including, but not limited to, the extensive and repeated flooding of the lots and the Park common areas, which interferes with the ingress and egress of the Homeowners and their guests to the lots and the common areas.

### 7.8.6   Defendants failed to comply with properly promulgated Park rules and regulations

233.   The Defendants failed to comply with properly promulgated Park rules and regulations.

234.   Section 723.022(5), *Fla. Stat.*, mandates that a "... mobile home park owner shall at all times ... comply with properly promulgated park rules and regulations." Section 723.022(5), *Fla. Stat.*, further mandates that a "... mobile home park owner shall at all times ... require other persons to ... comply therewith ...."

235.   Defendants have a continuing duty to comply with properly promulgated park rules and regulations under § 723.022(5), *Fla. Stat.*

236.   The Defendants have failed to comply with properly promulgated park rules and regulations as evidenced by the unreasonable elimination or reduction of services and facilities, including, but not limited to, the refusal to recognize the Adult Only" Retirement Community or 55 and older status of the Park.

### 7.8.7   Defendants unreasonably disturb or breach the peace of the Park residents

237.   The Defendants unreasonably disturb or breach the peace of the Park residents.

238.   Section 723.022(5), *Fla. Stat.*, mandates that a "... mobile home park owner shall at all times ... not unreasonably disturb the park residents or constitute a breach of the peace." Section 723.022(5), *Fla. Stat.*, further mandates that a "... mobile

home park owner shall at all times ... require other persons to ... not unreasonably disturb the park residents or constitute a breach of the peace."

239.    Defendants have a continuing duty to not unreasonably disturb the park residents or constitute a breach of the peace under § 723.022(5), *Fla. Stat.*

240.    The Defendants have unreasonably disturbed the park residents or constitute a breach of the peace as evidenced by the unreasonable elimination or reduction of services and facilities, including, but not limited to, the extensive and repeated flooding of the lots and the Park common areas, which interferes with the ingress and egress of the Homeowners and their guests to the lots and the common areas.

### 7.8.8    Defendants failed to comply with their statutory obligations of good faith and fair dealings

241.    Section 723.021, *Fla. Stat.*, mandates that "[e]very rental agreement or duty within this chapter imposes an obligation of good faith and fair dealings in its performance …."

242.    The Defendants' have not complied with their statutory obligations of good faith and fair dealings in violation of § 723.021, *Fla. Stat.*

243.    The Defendants have breached their statutory and contractual duties and as a direct and proximate result have caused the Plaintiffs to suffer substantial and actual damages.

244.    Pursuant to §§ 723.025 and 723.061(1)(c), *Fla. Stat.*, the Defendants must ensure the quiet and peaceful enjoyment of Plaintiffs' mobile home lots.

245.    The Defendants have breached their duty to permit the Plaintiffs to peacefully and quietly enjoy the possession of their lot and the Park.

246.    The Defendants breached their statutory warranty of habitability and duty in that they deprived Plaintiffs of the safe, healthy, and comfortable use of the

premises and disturbed the Plaintiffs' peaceful and quiet enjoyment of their lots and the Park.

247.    The Defendants have breached the lot rental agreement with the Plaintiffs, accompanying statutory warranty of habitability, and the express and implied covenant of peaceful and quiet enjoyment of their lots and the Park and as a direct and proximate result have caused the Plaintiffs to suffer substantial damages.

248.    Defendants have continually and repeatedly failed to comply with the requirements of the applicable building, housing, and health codes. Absent action by this Court, Plaintiffs will suffer further or future irreparable harm.

249.    Defendants have continually and repeatedly failed to maintain utility connections and systems for which the park owner is responsible in proper operating condition. Absent action by this Court, Plaintiffs will suffer further or future irreparable harm.

250.    Plaintiffs have no adequate remedy at law to stop the further or future noncompliance with the requirements of the applicable building, housing, and health codes.

251.    Plaintiffs have no adequate remedy at law to stop the further or future failure to maintain utility connections and systems for which the park owner is responsible in proper operating condition.

252.    Plaintiffs have a clear legal right to prohibitory and mandatory injunctive relief.

253.    Permanent injunctive relief will serve the public interest.

254.    Defendants never provided a written ninety (90) day notice to the Plaintiffs that their services were going to be eliminated or reduced as required by § 723.037(1), *Fla. Stat.*

255.    Defendants failed to provide an advance 90 day written notice to the Plaintiffs of the reduction or elimination of services and/or failure to maintain the common areas, improvements or buildings within the common areas in violation of § 723.037, *Fla. Stat.*

256.    Defendants have failed to comply with the terms and conditions in their lot rental agreements by improperly and unlawfully failing to provide a corresponding decrease in lot rental amount consistent with the reduction or elimination of services.

257.    Defendants have therefore breached their agreements with the Plaintiffs and caused them to suffer substantial losses and damages.

**8.0    Demand For Jury Trial**

Plaintiffs demand a jury trial as to all issues triable by jury in this case.

**9.0    Relief Requested (All Counts)**

Wherefore, as to all counts, Plaintiffs request that:

**9.1    Damages and prejudgment interest**

a.      Judgment be entered in favor of Plaintiffs and against Defendants Slider, Woodworth, Lawson, Sun Communities, Sun OLP, Sun Home Services, RP Village, RP Village2, ALL, AIOP, Lee, and Lutz Bobo Law Firm jointly and severally, in the amount of Plaintiffs' damages to be proven at trial;

b.      Plaintiffs be awarded treble damages to the extent permitted by 18 U.S.C. § 1964(c) and Section 772.104, *Fla. Stat.*;

c.      Plaintiffs be awarded punitive damages to the extent permitted by Section 768.72, Fla. Stat.;

d.      Plaintiffs be awarded damages for violations of the Florida Deceptive and  Unfair Trade Practices Act, pursuant to §§ 501.2075, 501.2077, and 501.211, *Fla. Stat.*;

e.      Plaintiffs be awarded damages from Defendants to Plaintiffs pursuant to § 723.017, *Fla. Stat.*;

f.      Plaintiffs be awarded prejudgment interest on the amount of damages and/or losses that Plaintiffs have sustained;

h.      Awarding all available damages to Plaintiffs including compensatory damages for economic losses, emotional distress, violation of their rights, and loss of housing opportunity;

**9.2     Escrow lot rental amount**

i.      Plaintiffs be permitted, pursuant to Rule 67(a), Fed. R. Civ. P., to deposit with the Court all or part of the ongoing lot rental payments obtained through the Defendants' unlawful and fraudulent behavior;

**9.3     Declaratory judgment**

j.      Plaintiffs be awarded a judgment declaring that the Defendants violated §§ 501.204, 501.211, and Chapter 723, *Fla. Stat.*

**9.4     Refund and reduction of lot rental amount**

k.      Plaintiffs be awarded, pursuant to § 723.033(1), *Fla. Stat.*, a refund of lot rental amount for the unreasonableness of lot rental increases, in light of the elimination or reduction of services, failure to maintain the sewer and storm water drainage system, violations of § 723.022, *Fla. Stat.*, and breach of the lot rental agreement;

l.      Plaintiffs be awarded, pursuant to § 723.033(1), *Fla. Stat.*, a reduction in lot rental amount for the unreasonableness of the resulting lot rental increases, in light of the elimination or reduction of services, failure to maintain the sewer and storm water drainage system, violations of § 723.022, Fla. Stat., and breach of the lot rental agreement;

*9.5     Injunctive relief*

m.      Plaintiffs be awarded a prohibitory injunction against Defendants pursuant to § 723.033(1)(f), *Fla. Stat.*, prohibiting future or further noncompliance with their obligations of good faith and fair dealings, including, but not limited to, recognition of the Park as an "Adult Only" retirement community and the attendant prohibition on children;

n.      Permanently enjoining Defendants from engaging in the conduct described herein and directing Defendants to take all affirmative steps necessary to remedy the effects of the conduct described herein and to prevent additional instances of such conduct or similar conduct from occurring in the future, including, but not limited to appointment of a monitor;

o.      Plaintiffs be awarded a mandatory injunction against Defendants pursuant to § 723.033(1)(f), *Fla. Stat.*, requiring the Defendants to repair their past noncompliance with their obligations of good faith and fair dealings;

p.      Plaintiffs be awarded injunctive relief pursuant to Rule 65, *Fed. R. Civ. P.;*

q.      Plaintiffs be awarded injunctive relief prohibiting defendants who have violated, are violating, or likely to violate Chapter 501 Part II, *Fla. Stat.*;

r.      Plaintiffs be awarded a judgment eliminating or vacating any recorded lien, if any, recorded by, or for the benefit of, the Defendants;

### 9.6   An Order finding noncompliance with obligations of good faith and fair dealing

s.      That the Court enter an Order pursuant to § 723.021, *Fla. Stat.*, finding that the Defendants have not complied with their obligations of good faith and fair dealings;

**9.7    Reasonable attorneys' fees and costs**

t.    Plaintiffs be awarded reasonable costs and attorney's fees pursuant to Sections 723.021 and 723.068, *Fla. Stat.*, to prevailing Plaintiffs for having proved the Defendants' noncompliance with their obligations of good faith and fair dealings;

u.    Plaintiffs be awarded reasonable costs and attorneys' fees pursuant to 18 U.S.C. § 1964(c); and §§ 501.2105, 501.211, 723.068, *Fla. Stat.*;

**9.8    Supplemental equitable and legal relief**

v.    Plaintiffs be awarded a judgment piercing of any limited liability veil;

w.    Plaintiffs be awarded award such other relief as the Court deems appropriate and just pursuant to § 723.033(1)(f), *Fla. Stat.*

x.    Plaintiffs be awarded such other and further equitable and legal relief as the Court deems just and necessary.

Dated: April 11, 2019.

Respectfully Submitted,

/S/ Daniel W. Perry
DANIEL W. PERRY
"Trial Counsel"
Fla. Bar No. 376671
4767 New Broad St, #1007
Orlando, FL 32814-6405
Ph: 407-894-9003
Email: dan@danielperry.com
Counsel for Plaintiffs